IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case Nos. CR 06-60069-01-AA |
| | CR 06-60070-01-AA |
| Plaintiff, | CR 06-60071-01-AA |
| | CR 06-60078-01-AA |
| v. | CR 06-60079-01-AA |
| | CR 06-60080-01-AA |
| DARREN TODD THURSTON, KEVIN | CR 06-60120-01-AA |
| TUBBS, KENDALL TANKERSLEY, | CR 06-60122-01-AA |
| STANISLAS GREGORY MEYERHOFF, | CR 06-60122-02-AA |
| CHELSEA DAWN GERLACH, SUZANNE | CR 06-60123-01-AA |
| SAVOIE, NATHAN FRASER BLOCK, | CR 06-60124-01-AA |
| DANIEL GERARD MCGOWAN, | CR 06-60125-01-AA |
| JONATHAN CHRISTOPHER MARK PAUL, | CR 06-60126-01-AA |
| JOYANNA L. ZACHER, | |
| | |
| Defendants. | MEMORANDUM OPINION |

_____

Aiken, Judge:

The court is asked to decide whether the sentencing

enhancement for terrorism under § 3A1.4 of the United States

Sentencing Guidelines applies to the defendants in the above-

1    - MEMORANDUM OPINION

captioned cases, based on their convictions for conspiracy to commit arson and destruction of an energy facility of the United States and for the predicate offenses of arson, attempted arson, and destruction of an energy facility.

On May 15, 2007, the court heard oral argument and testimony from one witness. As indicated during argument, outstanding factual disputes preclude the court from determining conclusively whether the terrorism enhancement applies to any particular defendant; these issues must be resolved at each defendant's sentencing hearing. In this opinion, the court addresses defendants' legal challenges to application of the enhancement and provides guidance, when appropriate, as to the factors the court must consider in deciding whether the enhancement applies.

At the outset, it is important to clarify the court's role in this proceeding. The issue the court must decide is not whether the defendants are "terrorists" as the word commonly is used and understood in today's political and cultural climate. Nor is it appropriate for the court to speculate whether the government seeks to promote a particular political agenda or to punish a particular form of activism in requesting the terrorism enhancement. Those are questions beyond the jurisdiction or purview of this court. The only issue before the court is whether defendants' admitted conduct and offenses of conviction render the terrorism enhancement applicable when imposing sentence. In other words, for purposes of

2    - MEMORANDUM OPINION

these proceedings, the debate is about the defendants' criminal conduct - not their political beliefs.

Additionally, contrary to many defendants' assertions, the court is not entering into unchartered waters.  As discussed in this opinion, the terrorism enhancement has been applied in several cases where the offenses of conviction caused only property damage. While the number of decisions may not be significant, these cases provide the court with considerable guidance.

Finally, the applicability of the terrorism enhancement is only one step in the sentencing process for these defendants. Regardless of whether the enhancement technically applies, the court retains discretion to depart upward or downward in determining the appropriate sentencing range and to impose a sentence that takes into account the nature and circumstances of the offenses and the history and characteristics of each defendant. Moreover, the parties' negotiated plea agreements and sentencing recommendations weigh heavily in the ultimate determination of sentence.

## I.  BACKGROUND

Pursuant to negotiated plea agreements, all defendants have pled guilty to one count of conspiracy to commit arson and the destruction of an energy facility in violation of 18 U.S.C. § 371. In addition to conspiracy, defendants Tubbs, Gerlach, Meyerhoff, McGowan, Savoie, Tankersley, Block, Zacher, and Paul pled guilty to

3    - MEMORANDUM OPINION

numerous counts of arson and attempted arson of property used in or affecting interstate commerce in violation of 18 U.S.C. § 844(i). Defendants Tubbs and Thurston also pled guilty to arson of federal government property in violation of 18 U.S.C. § 844(f)(1), and defendants Gerlach and Meyerhoff pled guilty to the destruction of an energy facility in violation of 18 U.S.C. § 1366(a). Defendants' convictions are based on the following undisputed facts, as admitted by defendants in their plea agreements and as set forth in the Presentence Investigation Reports and the government's sentencing memorandum.

Beginning in October 1996 and continuing through October 2001, defendants and other individuals formed a conspiracy to damage or destroy private and government property. Specifically, defendants conspired to commit a series of arson and other offenses on behalf of the Animal Liberation Front (ALF) and the Earth Liberation Front (ELF). The conspirators targeted federal government agencies and private parties they believed responsible for degradation of the environment, tree harvesting, and cruel treatment of animals. Eventually, the targets of arson expanded to include entities involved in genetic research.

Many of the conspirators attended and participated in "Book Club" meetings held in four different states to discuss and plan arson offenses. Topics at the Book Club meetings included lock-picking, computer security, reconnaissance of targeted property,

and the manufacture of timing devices to ignite improvised incendiary devices. The conspirators concealed their true identities by using code words and numbers, names and nicknames, and by producing or obtaining false identification documents.

Conspirators also formed "cells" or groups that planned and carried out each arson. In preparation for the arson offenses, conspirators designed and constructed incendiary devices, researched targeted facilities, conducted reconnaissance missions of the intended targets, and completed "dry runs" of the offenses. During the commission of the offenses, the conspirators wore gloves, masks, and dark clothing to disguise their appearance. Some of the conspirators acted as "lookouts" while others placed incendiary devices and accelerants at the targeted sites and concealed or destroyed evidence after commission of the crimes. Not all of the conspirators, including the defendants, participated in each offense; some participated in numerous arson offenses, while others participated in one or two offenses.

By 2001, the conspirators had committed numerous acts of arson or attempted arson and destroyed a high voltage electrical tower across five different states. The offenses included: arson of the Dutch Girl Dairy in Eugene, Oregon in December 1995; arson and attempted arson of the United States Forest Service (USFS) Ranger Station in Detroit, Oregon in October 1996; arson of the USFS Ranger Station in Oakridge, Oregon in October 1996; arson of Cavel

5    - MEMORANDUM OPINION

West Meat Packing Plant in Redmond, Oregon in July 1997; arson of the Bureau of Land Management (BLM) Wild Horse Corrals near Burns, Oregon in November 1997; arson of the United States Department of Agriculture Animal Plan Health Inspection Service and Animal Damage Control Facility in Olympia, Washington in June 1998; arson and attempted arson of Redwood Coast Trucking Company and Wayne Bare Trucking Company in Arcata, California in September 1998; attempted arson of the BLM Wild Horse Corrals near Rock Springs, Wyoming in October 1998; arson of a ski resort near Vail, Colorado in October 1998; arson of U.S. Forest Industries in Medford, Oregon in December 1998; arson of Childers Meat Company in Eugene, Oregon in May 1999; arson of a Boise Cascade office in Monmouth, Oregon in December 1999; destruction of a high-voltage energy tower near Bend, Oregon in December 1999; arson of the Eugene Police Department West Campus Public Safety Station in Eugene, Oregon in September 2000; arson of Superior Lumber Company in Glendale, Oregon in January 2001; arson of Romania Chevrolet Truck Center in Eugene, Oregon in March 2001; arson of Jefferson Poplar Farm in Clatskanie, Oregon in May 2001; arson of the University of Washington Horticulture Center in Seattle, Washington in May 2001; and arson of the BLM Litchfield Wild Horse and Burro Corrals near Susanville, California in October 2001. These actions damaged or destroyed numerous buildings and vehicles, causing tens of millions of dollars in damages.

After the arson offenses, the conspirators often sent "communiques" attributing responsibility for the particular arson to ELF or ALF and explaining the motivation for the offense. For example, a communique on behalf of ALF described the Cavel West arson in detail and accepted responsibility for destroying the "horse murdering plant." Similarly, following the fire at Childers Meat Company, a communique declared that "[a]s long as companies continue to operate and profit off of Mother Earth and Her sentient animal beings, the Animal Liberation Front will continue to target these operations and their insurance companies until they are all out of business." After the Litchfield BLM Wild Horse Corral arson, a communique was released opposing the asserted BLM policy of "round[ing] up thousands of wild horses and burros to clear public land for grazing cattle" and warning of future actions: "In the name of all that is wild we will continue to target industries and organizations that seek to profit by destroying the earth."

With respect to targeted timber companies, a communique described Superior Lumber as "a typical earth raper contributing to the ecological destruction of the Northwest" and expressed optimism that more timber companies would be targeted: "This year, we hope to see an escalation in tactics against capitalism and industry. While Superior Lumber says, 'Make a few items, and do it better than anyone else,' we say, 'choose an earth raper, and destroy them.'" A communique likewise described the "bonfire" at U.S.

Forest Industries and stated: "This was done in retribution for all the wild forests and animals lost to feed the wallets of greedy fucks like Jerry Bramwell, U.S.F.I. president.  This action is payback and it is a warning, to all other responsible we do not sleep and we won't quit."  Following the Boise Cascade arson, a communique stated:  "After ravaging the forests of the pacific northwest Boise Cascade now looks towards the virgin forests of Chile. . . . Let this be a lesson to all greedy multinational corporations who don't respect their ecosystems."

After the arson in Vail, Colorado, the conspirators issued a communique stating that the arson was committed "[o]n behalf of the lynx":

> Putting profits before Colorado's wildlife will not be tolerated.  This action is just a warning, we will be back if this greedy corporation continues to trespass into wild and unroaded areas.  For your safety and convenience, we strongly advise skiers to choose other destinations until Vail cancels its inexcusable plans for expansion.

Following the arson at Romania Chevrolet, a communique suggested that the arson was committed in honor of Jeffrey Luers, who had been charged and convicted for an earlier arson at the same location.  The communique declared, "We can no longer allow the rich to parade around in their armored existence, leaving a wasteland behind in their tire tracks.  The time is right to fight back. . . . We must strike out against what destroys us before we are all either choking on smog or held captive by the state."  A

communique also explained that the conspirators "torched Jefferson Poplar because hybrid poplars are an ecological nightmare threatening native biodiversity in the ecosystem. Our forests are being liquidated and replaced with monocultured tree farms so greedy, earth raping corporations can make more money."

Almost ten years after commission of the first arson, government agents identified a conspirator who became a cooperating witness. The cooperating witness informed the government of his involvement in specific acts of arson and identified others he conspired with in committing the offenses. The cooperating witness, at the direction of government agents, obtained recorded statements from other conspirators, eventually culminating in their arrests. Two alleged conspirators remain fugitives.

<u>DISCUSSION</u>

The government argues that the court should apply the terrorism enhancement set forth in § 3A1.4 of the United States Sentencing Guidelines (hereinafter "Sentencing Guidelines," "Guidelines" or "U.S.S.G") when calculating each defendant's sentencing range, resulting in a 12-level increase to the applicable offense level and an increase in the criminal history category to VI.

During oral argument, counsel for defendant Gerlach made a thoughtful observation that although the government seeks a 12-level enhancement for terrorism with respect to his client, the

9    - MEMORANDUM OPINION

government also recommends a 12-level downward adjustment for substantial assistance.  Further, the government recommends the same sentence of imprisonment regardless of whether the terrorism enhancement applies.  Thus, as counsel notes, the practical effect of the enhancement on defendants' negotiated plea agreements is relatively minimal.

The issue, however, is not academic.  Although district courts are not required to sentence within an applicable Guideline range now that the Sentencing Guidelines are advisory, United States v. Booker, 543 U.S. 220, 259-60 (2005), courts nevertheless "must consult [the] Guidelines and take them into account when sentencing."  Id. at 264.  "In other words, as was the case before Booker, the district court must calculate the Guidelines range accurately.  A misinterpretation of the Guidelines by a district court 'effectively means that [the district court] has not properly consulted the Guidelines.'"  United States v. Cantrell, 433 F.3d 1269, 1280 (9th Cir. 2006) (quoting United States v. Crawford, 407 F.3d 1174, 1178-79 (11th Cir. 2005)).  Thus, the court must fulfill its obligation to conduct a Guidelines calculation and determine the applicability of the terrorism enhancement, regardless of its actual effect.

"In order to calculate the applicable Guidelines range for a case, a sentencing court must first determine which Guidelines apply to the case."  United States v. Mix, 457 F.3d 906, 911 (9th

10   - MEMORANDUM OPINION

Cir. 2006).    Generally, a defendant is sentenced under the
Guidelines Manual in effect on the date of sentencing.    See
U.S.S.G. § 1B1.11.    However, in their plea agreements, all
defendants agree that the applicable Sentencing Guidelines are
those that became effective on November 1, 2000.    Therefore,
discussion of the terrorism enhancement is limited to that version
of the Guidelines, unless otherwise raised by the parties.

A.  History and Enactment of § 3A1.4

Under the Sentencing Reform Act of 1984, Congress created the
United States Sentencing Commission and charged it with developing
a comprehensive set of sentencing guidelines.    See 28 U.S.C. § 994.
Pursuant to this mandate, the "[Sentencing] Commission is required
to prescribe guideline ranges that specify an appropriate sentence
for each class of convicted persons determined by coordinating the
offense behavior categories with the offender characteristic
categories." U.S.S.G., ch. 1, pt. A, p. 1 (2000).    In doing so,
the Guidelines are intended to take into account "real offense
elements" through adjustments to the offense level based on
specific offense characteristics.    Id. at p. 5.

To arrive at the applicable Guidelines sentence, a district
court first determines the offense conduct and the corresponding
base offense level, after consideration of any relevant offense
characteristics outlined in Chapter Two of the Sentencing
Guidelines.    U.S.S.G. § 1B1.1 (Application Instructions).    The

11   - MEMORANDUM OPINION

court then applies upward or downward adjustments to the offense
level as set forth in Chapter Three and determines the offender's
criminal history category as specified in Chapter Four.    Id.
Finally, the court calculates the appropriate Guideline range and
considers whether any specific offender characteristics or
sentencing departures warrant consideration.    Id. At issue here is
the "Terrorism" enhancement in Chapter Three of the Guidelines.
U.S.S.G. § 3A1.4.

        Prior to 1994, the Sentencing Guidelines did not include an
enhancement for conduct relating to terrorism offenses.    Instead,
the Guidelines included a policy statement that provided: "If the
defendant committed the offense in furtherance of a terroristic
action, the court may increase the sentence above the authorized
guideline range."    See former U.S.S.G. § 5K2.15.

        In 1994, Congress passed the Violent Crime Control and Law
Enforcement Act of 1994.    Pub. L. 103-322 (1994).    Under that Act,
Congress directed the Sentencing Commission to

        amend its sentencing guidelines to provide an appropriate
        enhancement for any felony, whether committed within or
        outside the United States, that involves or is intended
        to promote international terrorism, unless such
        involvement or intent is itself an element of the crime.

Pub. L. 103-322 § 120004 (1994).

        Accordingly, the Sentencing Commission deleted the upward
departure policy statement and promulgated former § 3A1.4,
effective November 1, 1995:

12    - MEMORANDUM OPINION

(a) If the offense is a felony that involved, or was intended to promote, international terrorism, increase by **12** levels; but if the resulting offense level is less than level **32**, increase to level **32**.

(B) In each such case, the defendant's criminal history category from Chapter Four (Criminal History and Criminal Livelihood) shall be Category VI.

(Bold in original.) *Former* Application Note 1 explained that the term "international terrorism" was defined at 18 U.S.C. § 2331(1). Then, as now, § 2331(1) defines "international terrorism" as activities that:

(A) involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State;

(B) appear to be intended–

(i) to intimidate or coerce a civilian population;

(ii) to influence the policy of a government by intimidation or coercion; or

(iii) to affect the conduct of a government by mass destruction, assassination, or kidnapping; and

(C) occur primarily outside the territorial jurisdiction of the United States, or transcend national boundaries.

In 1996, Congress passed the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). See Pub. L. 104-132. As part of the Act, Congress directed the Sentencing Commission to "amend the sentencing guidelines so that the chapter 3 adjustment relating to international terrorism only applies to Federal crimes of terrorism, as defined in section 2332b(g) of title 18, United

States Code." <u>Id.</u> § 730 (1996). Accordingly, the Sentencing Commission promulgated an emergency amendment to § 3A1.4 that replaced the term "international terrorism" with "federal crime of terrorism." The amendment was re-promulgated without change, effective November 1, 1997, as follows:

> (a)  If the offense is a felony that involved, or was intended to promote, a federal crime of terrorism, increase by **12** levels; but if the resulting offense level is less than level **32**, increase to level **32**.

> (b)  In each case, the defendant's criminal history category from Chapter Four (Criminal History and Criminal Livelihood) shall be Category VI.

(Bold in original.) The language of § 3A1.4 remains the same, although the Commentary and Application Notes were amended in 2002.

The Commentary to the 2000 Sentencing Guidelines explains the application of § 3A1.4:

> 1.  Subsection (a) increases the offense level if the offense involved, or was intended to promote a federal crime of terrorism. "Federal crime of terrorism" is defined at 18 U.S.C. § 2332b(g).

> 2.  Under subsection (b), if the defendant's criminal history category as determined under Chapter Four (Criminal and Criminal Livelihood) is less than Category VI, it shall be increased to Category VI.

Thus, to determine what constitutes a "federal crime of terrorism" for purposes of applying the enhancement, courts must look to the statutory definition.

As of November 1, 2000, U.S.C. § 2332b(g) defined the term "federal crime of terrorism," in pertinent part:

(5)  the term "Federal crime of terrorism" means an offense that -

    (A)  is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct; and

    (B)  is a violation of -

        (i)  section . . . 844(f) or (i) (related to arson and bombing of certain property), . . . 1361 (relating to injury of Government property or contracts), . . . 1366 (relating to destruction of an energy facility, . . . .[1]

Thus, in order to apply the terrorism enhancement, the court must find that the offense of conviction involved or was intended to promote an enumerated offense intended to influence, affect, or retaliate against government conduct.

B.  Qualifying Offenses

Defendants assert several arguments against the application of § 3A1.4, many of which rely on the court's rejection of the plain language of the Guidelines and the underlying statutory definition of "federal crime of terrorism." First, defendants argue that the enhancement cannot apply to offenses - such as conspiracy - that are not specifically enumerated under § 2332b(g)(5)(B). Second, defendants argue that a federal crime of terrorism must create a substantial risk of harm and transcend national boundaries. Next,

---

[1]No defendant pled guilty to destruction of government property in violation of 18 U.S.C. § 1361; however, the government relies on this offense to support application of the enhancement.

defendants maintain that 2001 amendments to § 2332b(g)(5)(B) preclude application of the terrorism enhancement to convictions under 18 U.S.C. §§ 844(f)(1) and 1361.  Finally, defendants argue that the government cannot establish that their predicate offenses were calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct.

    1.  Conspiracy in Violation of 18 U.S.C. § 371

        a.  Application of  § 3A1.4 to Offenses Not Enumerated Under § 2332b(g)(5)(B)

    Defendants argue that commission of an enumerated offense listed under 18 U.S.C. § 2332b(g)(5)(B) is a prerequisite to application of the terrorism enhancement.  Defendants maintain that Congress did not intend for the enhancement to apply to offenses that are not identified as "federal crimes of terrorism." Therefore, defendants contend their convictions for conspiracy in violation of 18 U.S.C. § 371 cannot support the terrorism enhancement, because conspiracy is not defined as a "federal crime of terrorism."

    In determining the meaning of § 3A1.4, the court first looks to its language.  "Interpretation of the Sentencing Guidelines is similar to statutory interpretation . . . ."  United States v. Mandhai, 375 F.3d 1243, 1247 (11th Cir. 2004).  It is well settled that, "[i]n a statutory construction case, the beginning point must be the language of the statute, and when a statute speaks with

16   - MEMORANDUM OPINION

clarity to an issue judicial inquiry into the statute's meaning, in all but the most extraordinary circumstance, is finished." Estate of Cowart v. Nicklos Drilling Co., 505 U.S. 469, 475 (1992). Here, § 3A1.4 instructs courts to apply the enhancement "[i]f the offense is a felony that involved, *or was intended to promote*, a federal crime of terrorism . . . ." U.S.S.G. § 3A1.4 (emphasis added). Thus, the plain and unambiguous language of the enhancement does not require conviction of an offense defined as a "federal crime of terrorism," so long as the offense of conviction was intended to promote such a crime.

Several Circuit Courts of Appeals have held likewise. For example, in United States v. Graham, 275 F.3d 490 (6th Cir. 2006), the Sixth Circuit upheld the district court's application of the terrorism enhancement based on the defendant's conviction for conspiracy to commit offenses against the United States under 18 U.S.C. § 371. In applying the enhancement, the district court found that the defendant's participation in the conspiracy "was intended to promote" offenses listed in § 2332b(g)(5)(B), including the destruction of property used in interstate commerce in violation of 18 U.S.C. § 844(i) and the destruction of an energy facility in violation of 18 U.S.C. § 1366. Id. at 515.

The Sixth Circuit affirmed. The court examined the plain language of § 3A1.4 and found that the phrase "intended to promote" was distinct from "involved":

17   - MEMORANDUM OPINION

> A defendant who intends to promote a federal crime of
> terrorism has not necessarily completed, attempted, or
> conspired to commit the crime; instead the phrase implies
> that the defendant has as one purpose of his substantive
> count of conviction or his relevant conduct the intent to
> promote a federal crime of terrorism.  On this reading,
> the offense of conviction itself need not be a "Federal
> crime of terrorism."

Id. at 516.  Thus, the Sixth Circuit held that "the defendant need

not have been convicted of a federal crime of terrorism as defined

in § 2332(g)(5)(B) for the district court to find that he intended

his substantive offense of conviction or his relevant conduct to

promote such a terrorism crime."  Id. at 517.  However, the

district court must "identify which enumerated 'Federal crime of

terrorism' the defendant intended to promote."  Id.

Similarly, in Mandhai, 375 F.3d at 1247, the defendant was

convicted of conspiring to destroy buildings affecting interstate

commerce by means of fire or explosives.  The Eleventh Circuit

found that the defendant's offense involved or intended to promote

18 U.S.C. § 844(i) for purposes of the terrorism enhancement, even

though the defendant lacked the means to commit the underlying

predicate offenses.  Id. at 1247-48.

> Had the Guideline drafters intended that § 3A1.4 apply
> only where the defendant is convicted of a crime listed
> in 18 U.S.C. § 2332b(g)(5)(B), they would have included
> such limiting language.  Instead, they unambiguously cast
> a broader net by applying the enhancement to any offense
> that "involved" or was "intended to promote" a terrorism
> crime.

Id. at 1247.

Finally, in United States v. Arnaout, 431 F.3d 994, 1001-02

18   - MEMORANDUM OPINION

(7th Cir. 2005), the defendant was convicted of conspiracy to violate the Racketeer Influenced and Corrupt Organizations Act in violation of 18 U.S.C. § 1962(d) based on a scheme to defraud charity donors to raise money in support of Chechen and Bosnian soldiers. The Seventh Circuit found that, contrary to the district court's findings, the § 1962(d) conviction could serve as the basis for the terrorism enhancement "where the district court finds that the purpose or intent of the defendant's substantive offense or relevant conduct was to promote a federal crime of terrorism as defined by § 2332b(g)(5)(B)."[2]  Id.; see also United States v. Meskini, 319 F.3d 88, 92 (2d Cir. 2003) (terrorism enhancement applied based on conspiracy to bomb international airport); United States v. Wells, 163 F.3d 889, 899 (4th Cir. 1998) (upward adjustment for terrorism applied to bank and mail fraud cases).

Defendants nonetheless argue that Congress intended to limit a federal crime of terrorism to convictions of offenses specifically enumerated under § 2332b(g)(5)(B). Defendants rely on the AEDPA's directive that the Sentencing Commission amend § 3A1.4 - then applicable to offenses involving or promoting "international terrorism" - so that it "only applies to federal crimes of terrorism." Defendants maintain that the Sentencing Commission

---

[2]At the same time, the Seventh Circuit upheld the district court's refusal to apply the enhancement, because the government failed to produce evidence that the defendant's RICO offense was intended to promote a crime of terrorism. Arnaout, 431 F.3d at 1002.

thus undermined congressional intent by retaining the phrase "was intended to promote" in the language of § 3A1.4.

However, if the language of the Guidelines is clear and unambiguous, the court need not look to legislative history. As found in Graham, Mandhai, and Arnaout, I find that the language of § 3A1.4 clearly and unambiguously extends the terrorism enhancement to offenses that were intended to promote federal crimes of terrorism. Thus, no inquiry into congressional intent is warranted. Moreover, the legislative history cited by defendants is not necessarily persuasive.

In addition to the interpretation proposed by defendants, the AEDPA's directive that § 3A1.4 apply "only to federal crimes of terrorism" could be construed as requiring the replacement of the term "international terrorism" with the term "federal crime of terrorism" - just as the Sentencing Commission did. Given that Congress intended to broaden the scope of § 3A1.4, I do not find it contrary to congressional intent that the Sentencing Commission retained application of the Guideline to offenses that intended to promote federal crimes of terrorism. Indeed, since 1994, any upward departure or enhancement on the basis of terrorism has applied to offenses that involve or were intended to promote crimes of terrorism. See Pub. L. 103-322 § 120004 (1994).

In sum, I do not find that the plain language of the Guideline undermines congressional intent. Instead, I find persuasive and

adopt the reasoning of the Sixth, Seventh, and Eleventh Circuits in holding that the plain and unambiguous language of § 3A1.4 does not require conviction of an offense listed under § 2332b(g)(5)(B), so long as the offense of conviction was intended to promote a "federal crime of terrorism" as defined under that provision.

As applied to this case, defendants' convictions for conspiracy under 18 U.S.C. § 371 may support the terrorism enhancement if the government establishes that defendants' participation in the conspiracy involved or was intended to promote a "federal crime of terrorism." See Mandhai, 375 F.3d at 1248 ("[T]he terrorism enhancement does not hinge upon a defendant's ability to carry out specific terrorist crimes or the degree of separation from their actual implementation. Rather, it is the defendant's purpose that is relevant, and if that purpose is to promote a terrorism crime, the enhancement is triggered.").

### b.  Conspiracy Liability

A related issue raised at oral argument is whether and to what extent the conduct of one conspirator may be attributed to another for purposes of applying the terrorism enhancement to the defendants' conspiracy convictions.

Pursuant to the Sentencing Guidelines and well-established principles of conspirator liability, a conspirator is deemed responsible for the acts of his or her co-conspirators, if those acts were foreseeable and in furtherance of the conspiracy:

21   - MEMORANDUM OPINION

Unless otherwise specified, (i) the base offense level
where the guideline specifies more than one base offense
level, (ii) specific offense characteristics and (iii)
cross references in Chapter Two, and (iv) *adjustments in
Chapter Three*, shall be determined on the basis of the
following:

> (1)(A) all acts and omissions committed, aided,
> abetted, counseled, commanded, induced, procured,
> or willfully caused by the defendant; and
>
> (B) *in the case of a jointly undertaken criminal
> activity (a criminal plan, scheme, endeavor, or
> enterprise undertaken by the defendant in concert
> with others, whether or not charged as a
> conspiracy), all reasonably foreseeable acts and
> omissions of others in furtherance of the jointly
> undertaken criminal activity*,

that occurred during the commission of the offense of
conviction, in preparation for that offense, or in the
course of attempting to avoid detection or responsibility
for that offense . . . .

U.S.S.G. § 1B1.3(a) (emphasis added); see also United States v.
Bynum, 327 F.3d 986, 993 (9th Cir. 2003). "The conduct of others
that was both in furtherance of, and reasonably foreseeable in
connection with, the criminal activity jointly undertaken by the
defendant is relevant conduct under this provision." U.S.S.G. §
3A1.4, n. 2.

For example, in United States v. Gamez, 301 F.3d 1138, 1146-48
(9th Cir. 2002), the Ninth Circuit upheld application of a
sentencing enhancement for murder based on the shooting of a Border
Patrol Agent committed by the defendant's co-conspirator during a
drug trafficking offense. Even though the defendant had been
acquitted of murder charges, the court explained that the

22  - MEMORANDUM OPINION

enhancement nevertheless applied:

> Neither U.S.S.G. § 2D1.1(d)(1) [the cross-reference for murder] nor U.S.S.G § 1B1.3(a)(1)(B) require a sentencing court to find that the defendant in fact committed murder in order to apply the cross-reference. All that they require is that the court find that murder occurred in the course of commission of a drug-related conspiracy and that it was reasonably foreseeable and in furtherance of the conspiracy.

Id. at 1148; see also United States v. Riley, 335 F.3d 9189, 928-29 (9th Cir. 2003) (enhancing the defendant's offense level under § 1B1.3(a) based on the amount of loss resulting from his co-conspirator's fraudulent activities); United States v. Valencia, 15 F.3d 149, 151-52 (9th Cir. 1994) (applying § 1B1.3(a) to enhance the defendant's offense level based on quantities of drugs sold by a co-conspirator).

Similarly, § 3A1.4 does not require that the defendant commit a "federal crime of terrorism" in order for the enhancement to apply. Thus, pursuant to § 1B1.3(a), the terrorism enhancement applies if a co-conspirator committed a federal crime of terrorism during the course of the conspiracy and the offense was reasonably foreseeable and in furtherance of the joint criminal activity undertaken by the defendant. See Graham, 275 F.3d at 516-17 ("This interpretation of the phrase 'intended to promote' is in harmony with the fact that, pursuant to U.S.S.G. § 1B1.3, a defendant's base offense level may be adjusted for acts which the defendant did not necessarily commit but were committed by others in furtherance of a jointly undertaken criminal activity with the defendant and

23   - MEMORANDUM OPINION

were reasonably foreseeable to the defendant in connection with that activity.").

Notably, "[t]he scope of the jointly undertaken activity 'is not necessarily the same as the scope of the entire conspiracy.'" Riley, 335 F.3d at 928 (quoting U.S.S.G. § 1B1.3, n. 2). Further, a "defendant's relevant conduct does not include the conduct of members of a conspiracy prior to the defendant's joining the conspiracy, even if the defendant knows of that conduct." U.S.S.G. § 1B1.3, n. 2. Rather, "[e]ach conspirator is responsible only for the activities that fell within the scope of his particular agreement with the conspirators or activities, and that were reasonably foreseeable behavior in furtherance of that particular agreement." Id. (quoting United States v. Whitecotton, 142 F.3d 1194, 1198-99 (9th Cir. 1998)).

Therefore, at each defendant's sentencing, "the court must first determine the scope of the criminal activity the particular defendant agreed to jointly undertake." Whitecotton, 142 F.3d at 1197. Upon that determination, the court will then decide whether one or more co-conspirators committed a federal crime of terrorism that was reasonably foreseeable and in furtherance of that defendant's particular agreement. If so, the court may rely on the actions of co-conspirators in applying the terrorism enhancement.

## 2. Substantial Risk of Injury

Defendants next argue that their convictions under 18 U.S.C.

§§ 844(f)(1), 844(i), and 1366(a) cannot support imposition of the terrorism enhancement, because none of their offenses created a substantial risk of harm.  Defendants contend that Congress did not intend that the enhancement apply to offenses that caused only property damage but did not cause injury or death.

In support of their position, defendants first argue that the term "terrorism" is vague, because federal law contains numerous descriptions and definitions of "terrorism," demonstrating the lack of clarity as to its meaning.  Additionally, defendants note that the statutory scheme under 18 U.S.C. § 2332b, entitled "Acts of Terrorism Transcending National Boundaries," criminalizes conduct that "creates a substantial risk of serious bodily injury to any other person by destroying or damaging any structure, conveyance, or other real or personal property."  18 U.S.C. § 2332b(a)(1)(A).  Defendants also rely on the definition of "domestic terrorism," which includes "acts dangerous to human life that are a violation of the criminal laws of the United States or of any State."  Id. § 2331(5).

Finally, defendants cite legislative history, including previous versions of the AEDPA, that would have criminalized conduct resulting in substantial property damage without the additional requirement of a substantial risk of injury, thus evincing congressional intent to create a narrow definition of terrorism.  Although defendants concede that several offenses

25   - MEMORANDUM OPINION

enumerated under § 2332b(g)(5)(B) do not include an element of harm, defendants maintain that it is nonsensical for Congress to require a substantial risk of injury for certain terrorism offenses and not others.  Essentially, defendants argue that the label "terrorist" should apply to only those people who intend to wreak havoc and cause harm.[3]

However, this court is bound by the canons of statutory construction, and I find that resolution of this issue begins and ends with the plain language of the statute and Sentencing Guidelines.  First, application of § 3A1.4 does not premise application of the enhancement on a violation of § 2332b(a); rather, the offense of conviction must involve or promote a "federal crime of terrorism" as defined by § 2332b(g)(5).  Second, the definition of "federal crime of terrorism" does not import the element of "substantial risk of serious bodily injury" included in 18 U.S.C. § 2332b(a)(1)(A).  Instead, Congress defined a "federal crimes of terrorism" as the commission of specific offenses along

---

[3]To the extent defendants' offenses are not typical "terrorist" activities, the court has discretion to depart downward "[w]hen a court finds an atypical case, one to which a particular guideline linguistically applies but where conduct significantly differs from the norm." Koon v. United States, 518 U.S. 81, 93 (1996)(quoting U.S.S.G. ch. 1, pt. A, intro. comment. 4(b)); see also United States v. Garey, 383 F. Supp. 1374, 1378-79 (M.D. Ga. 2005) (finding that, although enhancement applied to defendant based on threats to blow up a City Hall, shopping mall, and news organization, a variance from the advisory guideline range was warranted), rev'd on other grounds, ___ F.3d ___, 2007 WL 1059097 (11th Cir. April 11, 2007).

with the intent or desire to influence, affect, or retaliate against government conduct.

Finally, several offenses enumerated under § 2332b(g)(5)(B) further contradict defendants' contention that Congress intended all terrorism crimes to create a substantial risk of injury. As amended, § 2332b(g)(5)(B) includes violations of 18 U.S.C. §§ 18 (relating to arson within maritime and territorial jurisdiction), 1030(a)(1) (relating to the protection of computers), 1361 (relating to government property or contacts), 1362 (relating to destruction of communication lines, stations, or systems), 1363 (relating to injury to buildings or property within territorial or maritime jurisdiction), and 1366(a) (relating to destruction or attempted destruction of an energy facility exceeding $100,000 in damages). None of these offenses include a substantial risk of injury as an element.

While Congress could have amended the definition of "federal crime of terrorism" to include a substantial risk of injury, it did not.[4] Accordingly, I find that a "federal crime of terrorism" under § 2332b(g)(5) does not require a substantial risk of injury.

---

[4]Defendants further argue they must have *knowingly* created a substantial risk of bodily injury in order for the enhancement to apply. Notably, defendants fail to present any basis to import a "knowingly" intent element, particularly when no such element is included in either § 3A1.4 or § 2332b(g)(5)(B). Regardless, because I do not find that a crime of terrorism requires a substantial risk of harm, I do not address this argument or the witness's testimony that, statistically, arson does not create a substantial risk of injury.

### 3.  National Boundaries

Defendants also argue that the terrorism enhancement applies only to federal crimes of terrorism that "transcend national boundaries."  Defendants emphasize that "federal crime of terrorism" is defined under 18 U.S.C. § 2332b, which criminalizes offenses "transcending national boundaries."  See 18 U.S.C. § 2332b(a).

However, as discussed above, application of § 3A1.4 does not depend on convictions for international terrorism offenses under § 2332b(a).  Further, as directed by Congress, § 3A1.4 references and imports only the definition of "federal crime of terrorism" for purposes of the enhancement.  United States v. Harris, 434 F.3d 767, 773 (5th Cir. 2005), cert. denied, 126 S. Ct. 1897 (2006).  Moreover, as noted by the Fifth Circuit, of the many numerous offenses listed under § 2332b(g)(5)(B), none require conduct transcending national boundaries.  Id.  Thus, the plain language of § 3A1.4 does not require a federal crime of terrorism to transcend national boundaries.

### 4.  2001 Amendments to § 2332b(g)(5(B)

#### a.  Conspiracy Offense

In its sentencing memorandum, the government maintains that defendants' conspiracy was intended to promote arson of government property in violation of 18 U.S.C. § 844(f)(1), arson of property affecting interstate commerce in violation of 18 U.S.C. § 844(i),

destruction of an energy facility in violation of 18 U.S.C. §
1366(a), and destruction of government property in violation of 18
U.S.C. § 1361.   However, defendants argue that the government
cannot rely on either § 844(f) or § 1361, because these offenses
were not enumerated as federal crimes of terrorism as of October
31, 2001, the day on which the conspiracy terminated.[5]

Effective October 26, 2001, the USA PATRIOT Act amended the
enumerated offenses under § 2332b(g)(5)(B).   Specifically, the
PATRIOT Act deleted § 844(f) generally and added § 844(f)(2) and
(3) as eligible "federal crimes of terrorism."  See Pub. L. 107-56,
§ 808 (2001).   Notably, § 844(f)(1) renders criminal the arson of
federal government property generally, while § 844(f)(2) and (3)
impose enhanced penalties if the offense resulted in a substantial
risk of injury or death or actual injury or death.   See 18 U.S.C.
§ 844(f).   The PATRIOT Act also deleted § 1361 as an enumerated
"federal crime of terrorism."  Pub. L. 107-56, § 808 (2001).

Consequently, defendants argue that after the enactment of
these amendments on October 26, 2001, the government cannot rely on
arson of government property under § 844(f)(1) or destruction of

_____

[5]Defendants also argue that the government did not disclose
its intent to rely on § 1361.  However, in all plea agreements,
the government disclosed its intent to seek the terrorism
enhancement under § 3A1.4, and the factual basis supporting the
conspiracy counts explicitly states that destruction of
government property was a purpose of the conspiracy, which would
constitute a violation of § 1361.  Further, as discussed above,
the terrorism enhancement does not require conviction of an
offense enumerated under § 2332b(g)(5)(B).

government property as offenses the defendants' conspiracy intended
to promote for purposes of the terrorism enhancement, because as of
the last day of their conspiracy, §§ 844(f)(1) and 1361 were not
considered a "federal crimes of terrorism."[6]

In their plea agreements, all defendants admit that the
version of the Guidelines effective November 1, 2000 applies to
their offenses of conviction.  Therefore, the government maintains
that the 2001 amendments to § 2332b(g)(5)(B) are irrelevant.
However, the question is not what version of the Sentencing
Guidelines apply; the language of § 3A1.4 has remained unchanged
since 1997.  Thus, the question is what offenses constituted
"federal crimes of terrorism" for purposes of applying the
terrorism enhancement.

Defendants are correct that generally the law in effect as of
last day of the offense applies.  "Conspiracy is a continuing
offense, which is charged and punished as one crime from beginning
to end."  United States v. Inafuku, 938 F.2d 972, 973 (9th Cir.
1995).  Thus, the last day of the conspiracy offense, as charged by

_____

[6]Defendants also argue that these amendments evince
congressional intent to limit the terrorism enhancement to
offenses that result in a substantial risk of bodily injury.
However, these amendments were not in effect when defendants
committed their predicate offenses.  Moreover, the 2001
amendments to § 2332b(g)(5)(B) did not delete other offenses that
do not require a substantial risk of harm, including 18 U.S.C. §§
844(i) and 1366(a).  For the reasons explained above, even if an
arson of federal government property under § 844(f)(2) requires a
substantial risk of property to constitute a crime of terrorism,
the definition as a whole does not so require.

the government and admitted by the defendants, was October 31, 2001.  As of that date, § 844(f)(1) and § 1361 were not listed as federal crimes of terrorism under § 2332b(g)(5)(B).  As such, defendants' offenses under §§ 844(f)(1) and 1361 cannot serve as the basis for application of the terrorism enhancement to defendants' conspiracy convictions.

### b. Arson of Government Property

Defendants Thurston and Tubbs also argue that the 2001 amendments likewise preclude application of the terrorism enhancement to their substantive arson offenses.  Tubbs and Thurston pled guilty to arson of federal government property in violation of § 844(f)(1) and were advised of the applicable twenty-year maximum sentence.  Neither defendant admitted that his arson offenses created a substantial risk of injury.  Thus, defendants argue that the 2001 PATRIOT Act amendments render the terrorism enhancement inapplicable to their convictions under § 844(f)(1), because they were not considered "federal crimes of terrorism" during the effective period of the 2000 Guidelines.

Specifically, defendants urge the court to apply § 1B1.11 of the Guidelines, which provides: "If the defendant is convicted of two offenses, the first committed before, and the second after, a revised edition of the Guidelines Manual became effective, the revised edition of the Guidelines Manual is to be applied to both offenses."  Thus, defendants argue that the "revised" definition of

31  - MEMORANDUM OPINION

§ 2332b(g)(5)(B), as incorporated by § 3A1.4, applies to the convictions under § 844(f)(1), because the arson offenses were committed before, and the conspiracy offense after, the effective date of the PATRIOT Act.

However, the language of § 3A1.4 remains unchanged, and the 2001 amendments to § 2332b(g)(5)(B) did not create a "revised" edition of the Guidelines.    Thus, the real issue is whether Thurston and Tubbs may benefit from the 2001 amendments to § 2332b(g)(5)(B), even though their predicate offenses were completed before the effective date of the PATRIOT Act.

Several courts have held that a defendant is not entitled to benefit from statutory amendments that become effective between the commission of a crime and sentencing.    See Davis v. Bryan, 889 F.2d 445, 448-49 (2nd Cir. 1989) (applying the sentencing statute in effect at the time the crime was committed rather than the statute adopted in the period between conviction and remand for resentencing after appeal); United States v. Haines, 855 F.2d 199 (5th Cir. 1988) ("[T]here is absolutely no constitutional authority for the proposition that the perpetrator of a crime can claim the benefit of a later enacted statute which lessens the culpability level of that crime after it was committed.    His culpability is adjudged on the basis of the laws that existed when he committed the crime.").

Further, under the general savings statute of the United

States Code:

> The repeal of any statute shall not have the effect to release or extinguish any penalty, forfeiture, or liability incurred under such statute, unless the repealing Act shall so expressly provide, and such statute shall be treated as still remaining in force for the purpose of sustaining any proper action or prosecution for the enforcement of such penalty, forfeiture, or liability.

1 U.S.C. § 109; see also Bradley v. United States, 410 U.S. 605, 608-09 (1973).

In this case, Thurston's and Tubbs' arson offenses involving government property - the Oakridge Ranger Station, the Burns Wild Horse Corrals, and the Litchfield Wild Horse Corrals - were committed prior to the enactment of the PATRIOT Act on October 26, 2001. Therefore, under the above analysis, the 2001 amendments to § 2332b(g)(5)(B) arguably do not apply.

At the same time, however, Thurston and Tubbs did not incur criminal liability under § 2332b(g)(5)(B); their culpability is premised on their conspiracy and arson convictions. Consequently, to the extent § 2332b(g)(5)(B) applies, it is only relevant as a Sentencing Guidelines factor. Further, under the defendants' plea agreements, the parties agreed that the 2000 Sentencing Guidelines would govern all guideline calculations. Of course, that raises the question of whether the 2001 amendments are applicable, because the PATRIOT Act was enacted while the 2000 Sentencing Guidelines remained in effect.

Under these unusual circumstances, the court must also

33   - MEMORANDUM OPINION

consider whether the rule of lenity should apply. "[T]he rule of lenity requires that we infer the rationale most favorable to [defendants] and construe the guidelines accordingly." United States v. Martinez, 946 F.2d 100, 102 (9th Cir. 1991). "If the Guidelines are 'truly ambiguous,' it is appropriate to apply the rule of lenity." United States v. Technic Services, Inc., 314 F.3d 1031, 1052 (9th Cir. 2002).

Given the fact that this issue applies to just two rather than all ten defendants, the court is inclined to reserve this issue until defendants' sentencing hearings, after receiving the benefit of additional argument from the parties.

    5.  Motivational Element

Defendants argue that the government cannot establish the necessary motivational element to support the terrorism enhancement, because their offenses were calculated merely to gain and generate publicity rather than to influence, affect, or retaliate against government conduct. Additionally, with respect to the arson of private property, defendants maintain that they targeted those businesses with the intent to influence or affect the conduct of private parties rather than the conduct of government. Finally, defendants argue that the government cannot rely on the victims' association or relationship with government entities to impute a particular motivation for the offenses to defendants.

34    - MEMORANDUM OPINION

The government responds that the court must look at the totality of the circumstances surrounding each arson to determine whether each offense was calculated to influence, affect, or retaliate against government conduct.

As stated during argument, the court cannot determine conclusively whether the offenses were intended to influence, affect, or retaliate against government conduct until relevant evidence is presented at the defendants' sentencing hearings. At the same time, defendants point is well taken; the definition of "federal crime of terrorism" explicitly requires an intent "to influence or affect the *conduct of government* by intimidation or coercion, or to retaliate against *government conduct*." 18 U.S.C. § 2332b(g)(5)(A) (emphasis added). Thus, the government must establish that the defendants targeted government conduct rather than the conduct of private individuals or corporations.

In seeming anticipation of this issue, the government argues that if the court finds that some or all of the offenses do not meet the criteria under § 3A1.4, the court may still impose an upward departure under Application Note 4 to the current version of § 3A1.4:

> However, there may be cases in which (A) the offense was calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct but the offense involved, or was intended to promote an offense other than the one of the offenses specifically enumerated in 18 U.S.C. § 2332b(g)(5)(B); or (B) the offense involved, or was intended to promote one of the offenses specifically

35   - MEMORANDUM OPINION

> enumerated in [§ 2332b(g)(5)(B)], but the terrorist
> motive was to intimidate or coerce a civilian population,
> rather than to influence or affect the conduct of
> government by intimidation or coercion, or to retaliate
> against government conduct.  In such cases an upward
> departure would be warranted, except that the sentence
> resulting from such a departure may not exceed the top of
> the guideline range that would have resulted if the
> adjustment under the guideline had been applied.

However, this application note did not become effective until November 1, 2002, after commission of the defendants' offenses. The government nevertheless argues that it is a clarifying amendment and does not implicate *ex post facto* concerns, because the court always possessed the authority to depart upward pursuant to U.S.S.G. § 5K2.0 based on conduct not adequately considered by the Sentencing Guidelines.

I question whether Application Note 4 is a "clarifying" amendment.  See United States v. Morgan, 376 F.3d 1002, 1010-11 (9th Cir. 2004).  On its face, it does not clarify or describe circumstances under which § 3A1.4 may be applied; it authorizes an upward departure based on conduct that is not contemplated by the enhancement - intimidating or coercing a civilian population. Further, the Sentencing Commission did not identify Application Note 4 as a clarifying amendment, and the government does not identify a conflict resolved by the amendment.  See id.; U.S.S.G. Supplement to Appendix C, Amendment 637 (2002) (describing Application Note 4 as a "viable tool to account for the harm involved during commission of these offenses on a case by case

basis.").

Regardless, even if Application Note 4 does not constitute an *ex post facto* law, the government agreed that the 2000 version of the Sentencing Guidelines would apply to the court's calculation of the Guidelines range. Therefore, the government cannot rely on Application Note 4 to depart upward and enhance the defendants' sentences. As noted by the government, the court may depart from the applicable Guideline range if it finds "that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described." U.S.S.G. § 5K2.0 (policy statement) (quoting 18 U.S.C. § 3553(b)).

Next, defendants argue that the government cannot use information obtained from defendants during their debriefings to establish the requisite intent to target government conduct. Defendants maintain that U.S.S.G. § 1B1.8(a) precludes the government's use of their debriefing statements against them at sentencing.

U.S.S.G. § 1B1.8(a) provides:

Where a defendant agrees to cooperate with the government by providing information concerning unlawful activities of others, and as part of that cooperation agreement the government agrees that self-incriminating information provided pursuant to the agreement will not be used against the defendant, then such information shall not be used in determining the applicable guideline range, except to the extent provided in the agreement.

37    – MEMORANDUM OPINION

However, as the government correctly notes, § 1B1.8 does not apply to defendants Block, McGowan, Zacher, and Paul, because they did not agree to provide information regarding the activities of their co-conspirators as part of their plea agreements.  Indeed, their plea agreements are premised on the condition that they not be required to incriminate their co-conspirators.  As stated in Application Note 6 to § 1B1.8:

> Unless the cooperation agreement relates to the provision of information concerning the unlawful activities of others, this guideline does not apply (*i.e., an agreement by the defendant simply to detail the extent of his own unlawful activities, not involving an agreement to provide information concerning the unlawful activity of another person, is not covered by this guideline*).

(Emphasis added.)  I am not persuaded by defendants' argument that providing the government with information that they committed offenses "with others" is the same as providing information "about others."  Therefore, § 1B1.8 does not prohibit the government from using the debriefing statements of Block, McGowan, Paul, and Zacher during these sentencing proceedings.

Finally, defendants argue that the § 3A1.4 applies to offenses that target the conduct of the <u>federal</u> government rather than state or local government entities.  Defendants maintain that the court should construe "government" as "the federal government," because otherwise the terrorism enhancement and § 2332b(g)(5) would "federalize" conduct that is reserved for enforcement by state or local authorities.  Further, defendants emphasize that Congress

38  - MEMORANDUM OPINION

defined the offenses as "federal crimes of terrorism," thus evincing congressional intent that the offense be calculated to influence, affect, or retaliate against the conduct of the federal government. Finally, defendants argue that the rule of lenity should apply to preclude the harsher and broader interpretation of "government."

I do not find defendants' arguments persuasive. First, the plain language of the statute does not identify a specific form or level of government. Rather, § 2332b(g)(5)(A) simply refers to the "conduct of government," signifying that all forms of government are included in the broad sweep of the phrase. See United States v. De Amaris, 406 F. Supp. 2d 748, 750-51 (S.D. Tex. 2005) (finding that "government" as set forth in § 2332b(g)(5)(A) includes foreign governments); see also Harris, 434 F.3d at 773 (applying enhancement to destruction of municipal building housing the local police station).

For the same reasons, I do not find that the rule of lenity is applicable or appropriate here. The statute clearly states "of government" with no jurisdictional limitation; there is no ambiguity that warrants application of the rule. Lastly, because the underlying offense must constitute a federal offense within the jurisdiction of the federal government, § 2332b(g)(5)(B) does not "federalize" conduct that would ordinarily be within the jurisdiction of state or local law enforcement authorities.

39   - MEMORANDUM OPINION

C.  Enhancement of Criminal History Category

Defendants mount a "facial" challenge to § 3A1.4's automatic increase of a defendant's criminal history category to Category VI, despite the fact that all defendants agreed that the sentencing issues need not be submitted to a jury and consented to fact-finding by the court.  Defendants argue that by increasing the criminal history category without regard for a defendant's actual criminal conduct, the enhancement upsets the balance intended by the Sentencing Guideline and violates defendants' rights to jury fact-finding under the Sixth Amendment.  See Booker, 543 U.S. 220.

However, Booker rendered the Guidelines advisory to remedy any constitutional violation that occurred when federal courts engaged in fact-finding that resulted in an increase in a defendant's "maximum sentence" under the Guidelines.  Id. at 256-57.  Thus, the Sixth Amendment is implicated only if the Guideline range exceeds the statutory maximum for the particular offense.  I find no distinction between judicial fact-finding resulting in an increased offense level from that resulting in an increased criminal history category, and the criminal history calculation under § 3A1.4 has been upheld against constitutional challenge.  See Meskini, 319 F.3d at 91-92 (finding that "the Sentencing Commission has a rational basis for creating a uniform criminal history category").

Morever, the case cited by defendants, United States v. Kortgaard, 425 F.3d 602, 609-10 (9th Cir. 2005), does not hold to

40  - MEMORANDUM OPINION

the contrary.    There, the Ninth Circuit held that because the defendant was sentenced prior to <u>Blakely</u> and <u>Booker</u>, "we consider the state of affairs at the time the defendant was sentenced." <u>Id.</u> at 605.    Thus, because the Guidelines were mandatory when the defendant was sentenced, the Ninth Circuit found that the upward departure violated <u>Booker</u> and remanded for resentencing.    <u>Id.</u> at 611.    Therefore, <u>Kortgaard</u> is distinguishable from this case, because the Guidelines are now advisory.

Finally, even if § 3A1.4 is deemed to apply and raises the defendants' criminal history category to VI, the court retains discretion to depart downward.    For example, the court may determine that a criminal history category of VI over-represents the serious of the defendant's past criminal conduct or the likelihood that the defendant will commit other crimes and depart downward under U.S.S.G. § 4A1.3.

D.  Fundamental Fairness and Sentencing Disparities

Defendants argue that application of the terrorism enhancement contravenes congressional intent that the Guidelines achieve fairness and avoid unwarranted disparities in sentencing. Defendants rely on the fact that the enhancement has not been sought in prosecutions of other Earth Liberation Front and Animal Liberation Front prosecutions, even those prosecutions related to this case (such as the University of Washington arson) or in prosecutions of persons who possessed biological toxins.

Defendants argue that the longer sentences they will receive render application of the enhancement unfair and disparate in light of their conduct.

However, the government retains the prosecutorial discretion to request the enhancement when warranted. If, as defendants strenuously assert, the government is overreaching due to political considerations, either the enhancement will not apply to defendants' offenses or defendants will be eligible for a downward departure because their conduct is outside the "heartland" of terrorism offenses. U.S.S.G. § 5K2.0.

Moreover, the terrorism enhancement has been applied in cases where far fewer or no acts of arson were committed. Application of the enhancement was upheld in <u>Harris</u>, where the defendant threw a Molotov cocktail into a municipal building housing the police department; in <u>Dowell</u>, where the defendant committed arson of an Internal Revenue Service office by pouring and igniting gasoline, and in <u>Mandhai</u>, where the defendant conspired to destroy property affecting interstate commerce but did not actually destroy such property. <u>Harris</u>, 434 F.3d at 774; <u>Dowell</u>, 430 F.3d at 1105; <u>Mandhai</u>, 375 F.3d at 1246.

When compared to the facts in <u>Harris</u>, <u>Dowell</u>, and <u>Mandhai</u>, defendants' ongoing conspiracy to damage and destroy government and private property and their numerous acts of arson - intended to frighten and intimate those who owned such property - do not render

42    - MEMORANDUM OPINION

application of the enhancement unfair or disparate.

Finally, defendants speculate that restrictive sentencing conditions could be imposed if they are labeled "terrorists" by virtue of the enhancement. However, defendants fail to explain how this factor can play any role in the court's legal analysis of whether the terrorism enhancement applies.

E.  Burden of Proof

Finally, defendants argue that the government must establish by clear and convincing evidence that their offenses of conviction involved or were intended to promote a federal crime of terrorism in order for the enhancement to apply. The government disagrees, although acknowledging that the Ninth Circuit has upheld a higher burden of proof in certain circumstances.

Specifically, the Ninth Circuit has held that "when a sentencing factor has an extremely disproportionate effect on the sentence relative to the offense of conviction, due process requires that the government prove the facts underlying the enhancement by clear and convincing evidence." United States v. Jordan, 256 F.3d 922, 926 (9th Cir. 2001) (citing United States v. Hopper, 177 F.3d 824, 833 (9th Cir. 1999)).

The court has identified several relevant factors, including: 1) whether "the enhanced sentence fall[s] within the maximum sentence for the crime alleged in the indictment"; 2) whether "the enhanced sentence negate[s] the presumption of innocence or the

prosecution's burden of proof for the crime alleged in the indictment"; 3) whether "the facts offered in support of the enhancement create new offenses requiring separate punishment"; 4) whether "the increase in sentence [is] based on the extent of a conspiracy"; 5) whether "the increase in the number of offense levels [is] less than or equal to four"; and (6) whether "the length of the enhanced sentence more than double[s] the length of the sentence authorized by the initial sentencing guideline range in a case where the defendant would otherwise have received a relatively short sentence." Id. at 928 (quoting United States v. Valensia, 222 F.3d 1173, 1182 (9th Cir. 2000), cert. granted, judgment vacated, and remanded by 532 U.S. 901 (2001)).

In this case, application of the enhancement increases the guideline range beyond the statutory maximum for the offenses of conviction with respect to defendants Tubbs, Meyerhoff, and Gerlach. Further, the increase in sentence is based, in part, on the extent of a conspiracy. Finally, the increase in offense level is greater than four, and the enhancement more than doubles the length of the sentence authorized by the initial sentencing guideline range for all defendants. These factors alone warrant a higher burden of proof. Thus, the government must present clear and convincing evidence that defendants' offenses of conviction involved or were intended to promote "federal crimes of terrorism" as defined under § 2332b(g)(5)(B).

III.  CONCLUSION

In sum, the court finds that the terrorism enhancement under § 3A1.4 may apply to defendants' convictions for conspiracy under 18 U.S.C. § 371 if the government establishes that defendants' participation in the conspiracy involved or was intended to promote a "federal crime of terrorism."  Further, the court finds that a "federal crime of terrorism" does not require that the offense create a substantial risk of injury or transcend national boundaries.  However, the government cannot rely on arson or destruction of government property under 18 U.S.C. §§ 844(f)(1) or 1361 as offenses the defendants' conspiracy intended to promote for purposes of the terrorism enhancement. Likewise, the government cannot rely on Application Note 4 of § 3A1.4 to support an upward adjustment based on coercion or intimidation of a civilian population.  The court also finds that the increase in criminal history category under § 3A1.4 does not violate defendants' Sixth Amendment rights.  Finally, the government must establish the applicability of the terrorism enhancement by clear and convincing evidence.

///

///

///

///

///

45   - MEMORANDUM OPINION

The court understands and appreciates defendants' concerns regarding the fundamental fairness of the terrorism enhancement and the consequences defendants may face as a result of its imposition. However, as indicated during oral argument, the court's obligation is to determine the application of the enhancement based on the applicable law.  Through this opinion, it is the court's hope that the parties have the guidance they need for purposes of the defendants' individual sentencing hearings.

DATED this 21st day of May, 2007.


/s/ ANN AIKEN
Ann Aiken
United States District Judge

46   - MEMORANDUM OPINION