1              IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF OREGON

3    UNITED STATES OF AMERICA,            )

                                          )
4                   Plaintiff,            )
                                          ) No. 06-CR-60071-1-AA
5        v.                               )
                                          ) August 3, 2007
6    KENDALL TANKERSLEY,                  )
                                          ) Eugene, Oregon
7                   Defendant.            )

8

9                 TRANSCRIPT OF PROCEEDINGS

10           BEFORE THE HONORABLE ANN AIKEN

11          UNITED STATES DISTRICT COURT JUDGE

12

13                      -:-

14

15

16

17

18

19

20

21

22

23              Deborah Wilhelm, CSR, RPR
                     Court Reporter
24                   P.O. Box 1504
                  Eugene, OR  97440
25                   (541) 431-4113

42

```
 1                    APPEARANCES OF COUNSEL

 2

 3    FOR THE PLAINTIFF:    KIRK A. ENGDALL
                            JOHN C. RAY
 4                          United States Attorney's Office
                            405 E. 8th Avenue
 5                          Suite 2400
                            Eugene, OR   97401
 6                          (541) 465-6771

 7

 8    FOR THE DEFENDANT:    LEE D. FOREMAN
                            Haddon, Morgan, Mueller, Jordan,
 9                            Mackey & Foreman, PC
                            150 E. 10th Avenue
10                          Denver, CO 80203
                            (303) 381-7364
11

12                          ROSALIND M.  LEE
                            McCrea, PC
13                          1147 High Street
                            Eugene, OR   97401
14                          (541) 485-1182

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    (Friday, August 3, 2007; 1:46 p.m.)
 2                    P R O C E E D I N G S
 3              THE CLERK:  This is the time set for Criminal
 4    06-60071, United States of America versus Kendall
 5    Tankersley, imposition of sentence.
 6              THE COURT:  Mr. Ray.
 7              MR. RAY:  Your Honor, there are two issues
 8    which the parties would like the court to address this
 9    afternoon.
10              First, of course, the propriety of the upward
11    departure; and, second, an issue with regard to
12    restitution, which has arisen since the previous
13    hearing.
14              THE COURT:  I wondered why I was given a
15    preview of those documents, so, all right, let's hear
16    what the problem is.
17              MR. RAY:  First, with regard to the propriety
18    of the upward departure, the court has granted in part
19    the defendant's second amended motion for the limited
20    purpose of allowing argument as to whether departure
21    under 5K2.0 is warranted in this case.
22              The government submits that it is for the
23    reasons that the court articulated during the previous
24    sentencing hearing.  The court exercised its --
25    specifically, the court exercised its discretion under
```

1   5K2.0 to upwardly depart by 12 levels based upon its
2   finding that the guidelines did not adequately take into
3   consideration the defendant's intent to frighten,
4   intimidate, and coerce private individuals at the time
5   of the U.S. Forest Industries arson.

6          The court pointed out, in particular, the
7   dramatic wording of the communique, and actually recited
8   it in its entirety at the previous sentencing hearing.
9   I won't do that.  It is Government Exhibit 15, a copy of
10  which I've provided to counsel once again and to the
11  court, should either of you need to make reference to
12  that.

13         The court also cited, as an aggravating factor,
14  the fact that after the incendiary devices failed to
15  ignite the first time, Ms. Tankersley and her
16  codefendant went back to the scene and reset them.
17  Based upon those factors, the court appropriately
18  departed upward 12 levels.

19         Then, the court carefully considered all the
20  3553(a) factors, which were fully presented at the
21  previous hearing, granted the government's motion to
22  depart downward four levels for substantial assistance,
23  and then afforded Ms. Tankersley an additional one-level
24  downward departure for her extraordinary cooperation
25  with the government.

1        The court then imposed a sentence of 46 months,
2   which was the right thing to do at that time and it
3   still is.

4        The court could also reach this same
5   disposition and obviate the upward departure issue by
6   simply imposing the mandatory minimum 60 months and then
7   departing downward 14 months or one level for the
8   substantial assistance.

9        Second, the restitution issue:  At the previous
10  hearing on May 31st, the government provided the court
11  with Government Exhibit 18, a copy of which I provided
12  to counsel and to the court again, and indicated to the
13  court that there were two victims that were deserving of
14  restitution, National Union Fire Insurance Company and
15  U.S.F.I. Holdings, together with the restitution figures
16  that were owed to those entities.

17       Last week, I learned from Mark Noffke, the
18  former chief financial officer with U.S. Forest
19  Industries, that the information he had previously
20  provided me was incorrect, and that the correct insurer
21  for U.S. Forest Industries, instead of National Union
22  Fire Insurance Company, was Zurich American Insurance
23  Company.  And that the correct restitution figure,
24  instead of what I quoted to the court previously, was,
25  in fact, $883,615.99.

| | |
|---|---|
| 1 | As documentation for this, I would offer what |
| 2 | has been marked as Government Exhibit 20 for |
| 3 | identification, a copy of which I've provided to |
| 4 | counsel.  This is a packet which contains an explanatory |
| 5 | cover letter from George Shumsky, the counsel for Zurich |
| 6 | American Insurance Company; an affidavit from a |
| 7 | representative of Zurich; and copies of payments made by |
| 8 | Zurich to U.S. Forest Industries, which total |
| 9 | $883.615.99. |
| 10 | I would ask the court to impose this |
| 11 | restitution figure made payable and -- and make it |
| 12 | payable to Zurich American Insurance Company.  And to |
| 13 | reimpose the $100,000 figure for U.S.F.I. Holdings |
| 14 | which -- |
| 15 | THE COURT:  Is a deductible. |
| 16 | MR. RAY:  -- is the deductible, and U.S.F.I. |
| 17 | Holdings was -- is in effect because U.S. Forest |
| 18 | Industries is no longer in existence.  Rendering a total |
| 19 | restitution figure of $983,615.99, which is slightly |
| 20 | over $6600 less than what we previously requested. |
| 21 | THE COURT:  So what's the issue? |
| 22 | MR. RAY:  I don't think there is an issue |
| 23 | except that I needed to -- |
| 24 | THE COURT:  Oh, okay. |
| 25 | MR. RAY:  -- advise the court of that.  I don't |

1  think Mr. Foreman has any problem with it.

2       THE COURT:  Okay.  I was wondering what was

3  going to be the issue.

4       MR. FOREMAN:  No issue.

5       THE COURT:  Thank you.

6       MR. FOREMAN:  Your Honor, on the last point

7  with regard to the restitution issue, you should know

8  that our representatives have actually already made

9  contact, or attempted to make contact with the right

10  person.  And our hope is that we're going to make some

11  progress on that front.  And if and when we do, I'll be

12  certain to let you know kind of what's going on, with

13  regard to the restitution order.  But it's -- to get the

14  figures right and to get the payee right, certainly

15  makes perfect sense to me.

16       THE COURT:  Would you just update me, as I

17  recall, in going back to read all of the documents, does

18  that include the monies that had been held for her

19  release as well as her house, and how is that piecing

20  together?  Are you taking all those resources then and

21  negotiating with the -- for, like, a present value?

22       MR. FOREMAN:  $150,000 of the bond, I think the

23  bond currently is $250,000.

24       THE COURT:  Right.

25       MR. FOREMAN:  The first $150,000 was actually

1    posted in Arizona.

2              THE COURT:  Right.

3              MR. FOREMAN:  And it had to do with liquidating

4    a certain number of her assets and encumbering certain

5    others, with the effect being that that money is, in

6    fact, her money.  That -- we assume that at the time

7    that that bond is released, that that $150,000 will be

8    taken by the court and applied to whatever the

9    outstanding restitution figure is.

10             And in terms of the order of it, we just leave

11   that to the court.  But that gives us a leg up on --

12   against the total amount of the restitution figure.

13             We accept the numbers of the $883,000 --

14   actually, I guess $983,000 as a total restitution

15   figure, and assume that even if after the $150,000 is

16   paid, there will be a substantial amount yet due and

17   owing, just with the simple arithmetic, which we do not

18   quarrel with.  We think the restitution order is

19   mandatory, and that you have to enter it, and we're fine

20   with that.

21             The remaining $100,000 that was posted for her

22   bond here actually came from her parents.  And we would

23   assume that since that was not money that Kendall ever

24   had access to or ownership interest in, that at the

25   appropriate time when the bond is released that

1    additional 100 would be returned to her family.

2            THE COURT:  I would -- just as a matter of

3    curiosity, I know in Mr. Paul's case, which I concluded

4    this week, there was a negotiation on a civil context of

5    that --

6            MR. FOREMAN:  Yes.

7            THE COURT:  -- restitution, and -- amount, and

8    that, as such, has been completely satisfied.  So you

9    are telling me, what I'm hearing, is there are ongoing

10   negotiations at the present time?

11           MR. FOREMAN:  That's correct.  Although, we

12   have hopes, now that we have the right person and the

13   right company, of engaging in a negotiation and

14   presenting any result thereof to you for your approval.

15           THE COURT:  (Nodding head.)  And I appreciate,

16   I see Mr. Ray is clearly moving on, but I sent out a

17   written order so that we just didn't have to debate the

18   issue, and just assume you are happy to proceed to

19   discuss the merits of what we need to talk about today.

20           MR. FOREMAN:  Happy to proceed.

21           THE COURT:  Fine.

22           MR. FOREMAN:  First of all, Your Honor, I do

23   want to tell you that I do very much appreciate the

24   opportunity to address you and to present some

25   additional arguments on the point that is before us

1  today.

2       In assessing the propriety of the court's

3  proposed upward departure, it seems to me that we need

4  to start with an analysis otherwise of what happens in

5  this case in connection with -- or what the guidelines

6  would show for an arson, where the government has

7  essentially agreed that the mandatory minimum -- the

8  five-year mandatory minimum does not really apply in

9  this case.

10       And without wanting to quibble too much about

11  exactly that the words are, you're aware that the plea

12  agreement in this case originally proposed that the

13  government would recommend to the court a sentence of

14  51 months, which was below the 60-month mandatory

15  minimum.  And, indeed, in that case -- in this case, as

16  well as in other cases where there have been similar

17  plea agreements, it has been your exercise of discretion

18  to allow further reductions in that.

19       We think that as a starting point, as a matter

20  of law, that once the plea agreement says that the

21  government will recommend to the court that any sentence

22  that be imposed is less than the mandatory minimum, that

23  the court essentially has opened up its discretion and

24  can do certain things within its sound discretion.

25       And that's different from some of the plea

1    agreements, because I know there is at least one where
2    it was essentially a fixed number that the government
3    and the defendant agreed to.  And I think it was 37
4    months.  And the stipulation in that case was that the
5    defendant was not allowed to argue below that number.

6            That's not the stipulation in this case.  When
7    we agreed that the government's recommendation would be
8    in the area of 51 months, it was with the clear
9    understanding that the defendant was free to argue that
10   the appropriate sentence should be a number less than
11   that.  And, indeed, we think that's what the court not
12   only has presumptively done, but would need to do under
13   the circumstances.

14           But in any event, just looking at a starting
15   point for this analysis in terms of the impact of the
16   proposed upward departure on the sentence in this case,
17   I think it's instructive to go back and take a look at
18   what the offense would look like in a guideline
19   sentence, assuming that the mandatory minimum was not
20   controlling, and assuming that we haven't gotten to the
21   issue yet of an upward departure under 5K2.0.

22           And when we put in our paperwork before, and we
23   submitted our objections to the Probation Department,
24   and did a kind of alternative calculation at that point,
25   and I'm not going to go through all of it, because,

1    frankly, it's all there in the record and you can see

2    it, but the bottom is that we suggested, in our papers,

3    that the appropriate guideline sentence under these

4    circumstances had a range of from 15 to 21 months.

5          Now, in fairness, that involved an assumption

6    on our part that we would receive four downward level

7    departures for a -- the role in the offense.  And I

8    sometimes get confused about which is minimal and which

9    is minor, but one of them is two and one of them is

10   four.  And we had urged, and the government had

11   recommended, that it be a four-level downward departure.

12         The Probation Department had taken the position

13   that only two was appropriate.  And, in fact, that was

14   what the court did in this case.  It suggested that a

15   two-level downward adjustment for role in the offense

16   was the appropriate adjustment to make under those

17   circumstances.  We're not revisiting that.

18         All I wanted to sort of say was that even under

19   the circumstances where my calculations, as originally

20   presented, were wrong, and only a two-level downward

21   adjustment for role in the offense were allowed, the

22   presumptive guideline range under those circumstances

23   would have calculated out to be 24 to 30 months.

24         And it's my argument to you today, as a

25   starting point for assessing the propriety of the upward

1   departure, that that's the heartland of sentences under

2   circumstances that we're dealing with.

3          We've looked at all the factors that are part

4   of the overall sentencing guideline, and -- looking at

5   all of them, and in the absence of the proposed upward

6   adjustment, the heartland for an arson case involving

7   this loss with this role in the offense is, in fact, 24

8   to 30 months.

9          So the key is there for 5K2.0, which we knew it

10  would be before we got here today.  And I would suggest

11  that unless you utilize an upward adjustment, an

12  appropriate sentence has to be in the 24 to 30 months

13  range.

14         Now, the justification for the proposed upward

15  adjustment, my recollection is the primary focus was on

16  the communique that was issued.  I think Mr. Ray is

17  right in the sense that you certainly in your sentencing

18  comments noted that Ms. Tankersley had gone and

19  attempted to set a fire, and a few days later had gone

20  back and set, in fact, a fire.

21         I would submit, however, that that's not really

22  the controlling issue, because she pled guilty to both

23  those crimes as separate offenses and has received --

24  and will receive separate punishments for both of those

25  separate offenses.

1        So the way that I understand the guidelines
2   work is that once we sort of calculate what the relevant
3   conduct is, which includes all of the offenses,
4   certainly, to which she's entered pleas of guilty, that
5   becomes the basis for the guidelines calculation.  And
6   my contention is that the heartland, including all of
7   those offenses, is within the range I've previously
8   indicated.

9        So what we're really talking about, I think, is
10  the communication -- or the communique that was issued
11  in the aftermath of these events.  And just in passing,
12  I would note that in this case, I don't think there is
13  any evidence of a substantial note that the communique
14  had the type of impact on anybody relevant to this case
15  that is kind of suggested.  I mean, I -- I'll come back
16  to this, but my assessment of Mr. Bramwell's testimony,
17  who I listened to quite attentively, was that he and his
18  company actually took these events in stride, and that
19  there was minimal psychological impact, actual
20  psychological impact on them, or adverse impact upon
21  their business other than the losses caused by the arson
22  itself.

23        Now, I'll come back to that because I think it
24  bears on it, but in connection with the determination to
25  impose an upward departure in relationship to the

 1    communique, I will notice -- note that there were two

 2    other defendants who are at least relevant to talk about

 3    in connection with the upward departure.  One of them

 4    was Mr. Tubbs.

 5         Mr. Tubbs, it is my recollection, received a

 6    one-level upward departure for his role in offenses

 7    including U.S. Forest Industries.

 8         THE COURT:  I have a lot to say that I will

 9    pick up from my earlier sentencing that will best

10    articulate exactly what I did in conjunction to this

11    case, because it's a different set of calculations, but

12    addressing the -- in the context of across-the-board all

13    10 of them, how I had to address certain groupings in

14    doing the calculations, so I'll be talking about that,

15    so I --

16         MR. FOREMAN:  I'm not going to belabor it.

17         THE COURT:  Good.

18         MR. FOREMAN:  I mean, I've certainly read your

19    earlier remarks in connection with other sentencing

20    hearings.  I kind of know where you are coming from.

21    And I do understand that in Mr. Tubbs' situation, just

22    by way of example, the fact that you had found the

23    terrorism enhancement applicable in numerous other

24    counts had something to do with what you did in

25    connection with this particular upward adjustment for

1  U.S. Forest Industries.

2        But I'd be remiss if I didn't point out that in
3  his circumstances that the upward adjustment, in fact,
4  as it appears of record, it was but one level.  And the
5  other one that I think is -- and this one is a little --
6  I confess -- a little hazy to me, it has to do with
7  Mr. Thurston.

8        Mr. Thurston, as I understand it, received a
9  fixed sentence of 37 months.  And although there may
10  have been some upward adjustments, my recollection is
11  that the subject of the communique in connection with
12  U.S. Forest Industries was not cited to the court as a
13  basis for anything in connection with his sentencing.
14  And I only mention that, again, in passing because if,
15  in fact, we are dealing with the -- that circumstance,
16  that communique, and the government had put in its
17  paperwork that it submitted in a sentencing memorandum
18  that he, too, had been involved in the U.S. Forest
19  Industries, I mean, I understand that he pled guilty to
20  a different substantive offense.  Having said that, it
21  would seem to me that his involvement in this
22  communique, as well as several others, which I
23  understand he was involved in over the course of a
24  relatively extended period of time, would certainly have
25  some effect upon how one evaluated, at a minimum, the

1    conspiracy count, which he also entered a plea of guilty

2    to.

3        I accept the fact he didn't plead guilty to

4    U.S. Forest Industries.  Hard to argue that his

5    involvement in communiques in a variety of different

6    contexts aren't acts in furtherance of his

7    conspiratorial efforts, and, therefore, would be

8    relevant in looking at his circumstances, it seems to

9    me.

10        And I guess the reason that I think it's

11   important that I make reference to it, Your Honor, is

12   that one of the clear objections of the sentencing

13   provisions and 3553, in particular, is to treat

14   similarly situated people similarly.  And I am -- I

15   submit to you that under the circumstances before you,

16   it seems unjustifiable to impose a 12-level upward

17   adjustment on Ms. Tankersley for her vicarious

18   involvement in the communique that issued, and not to

19   talk about that at all, and not to impose a similar

20   adjustment on Mr. Thurston for what appears to be a

21   similar role.

22        THE COURT:  I'm going to interrupt you, because

23   I'm going to -- this is by way of comment and a question

24   that I'll ask of the government, and I -- as just a

25   point of reference.  As you all know, and everybody has

1    tried to argue that collectively the entire group of

2    ten, and then individually work within that context.

3    There are negotiations in each and every case.  People

4    picked and selected the crimes to which they are going

5    to plead guilty to.  There was a vast array of

6    negotiations that took place.  And in the context of

7    those negotiations, the court agreed and accepted those

8    pleas.

9           And then we have the exercise of applying the

10   guidelines, with constraints and agreements, distinct

11   and yet somewhat similar and somewhat different in each

12   case.

13          And Mr. Thurston does come in as -- sort of at

14   a different angle.  I've noted that throughout.  And

15   that's a question I'm going to have to ask the

16   government, because it's not similar, and yet it's a

17   concern to the court that we address that, or that the

18   government put on the record why it is appropriate in

19   the context of this particular sentencing.  But it's

20   sort of, again, people want to have the benefits of the

21   plea agreement, and then want to argue sort of a

22   different calculation, forgetting that the court does

23   have a discretion with 3553 categories.

24          So I'm happy if you continue to argue those

25   calculations, but it's probably more helpful if you look

```
 1   at how to, on the broader scale, address the individual
 2   differences under 3553 categories.
 3            MR. FOREMAN:  Fair enough, Your Honor.  And,
 4   again, I don't -- I have the benefit, of course, now of
 5   having had the opportunity to read some of your remarks
 6   in connection with the other sentencings.  And I am not
 7   working on a blank slate here.
 8            THE COURT:  I know that.
 9            MR. FOREMAN:  And I'm just trying to, as best I
10   can, bring points to your attention for your
11   consideration that I think are at least relevant in
12   assessing --
13            THE COURT:  No, I've thought about --
14            MR. FOREMAN:  -- these points.
15            THE COURT:  -- them inside out, and upside --
16            MR. FOREMAN:  Okay.
17            THE COURT:  -- down.  And, again, one of the
18   things I would tell you is because this case wasn't
19   tried, there are lots of facts that both you and Mr. Ray
20   and both teams know about that I don't know about.  And
21   there were some -- I would say in the context of
22   negotiations, there were some professional decisions
23   made about which issues were stronger or which sets of
24   evidence compelling or not compelling.  And people made
25   those decisions.
```

1    So it's always a challenge for a sentencing
2  court when you individually know more about all those
3  factors and how to look at them, and we're given what
4  we're given to make some decisions.

5    So -- and, again, in the context of the federal
6  process, looking behind those agreements or arguing
7  outside the document that you entered into, tends to get
8  sideways with the Ninth Circuit, and so I'm careful
9  about how we even discuss some of this.

10    MR. FOREMAN: And I'm -- I don't want anything
11  I say to suggest that we're repudiating the plea
12  agreement. I mean, the plea agreement was, in fact,
13  negotiated and it was entered into. And there were a
14  couple of assumptions that were part of what we were
15  doing in that. And one of them, an assumption, was that
16  the -- that the government intended to argue that the
17  terrorism enhancement was applicable to my client, for
18  example. But it didn't know that. And it didn't ask
19  that we stipulate to that. It was going to make that
20  argument to you for your assessment. And, in fact, that
21  happened in this case.

22    And the other part of it that I think is
23  relevant --

24    THE COURT: And they had their alternative
25  argument as well.

1          MR. FOREMAN:  They did have an alternative

2     argument.  But if I look at the plea agreement and

3     select for myself -- if I am allowed to cherry-pick it a

4     little bit, the --

5          THE COURT:  That's exactly what has been going

6     on.  And I appreciate your calling it for what it is,

7     because that's exactly how people approach the

8     sentencings, as well they should.  And that's just fine

9     to argue their strengths.  But at the same time, I'm

10    just, in the bigger picture, I'm looking at mathematical

11    calculations.  And Mr. Ray is giving two frameworks to

12    walk through that analysis to get to the number that

13    he's recommended the court impose.  And I appreciate

14    your having another way of looking at it.

15          But, again, that's one structure that the court

16    is going to look at.  The other is that plea agreement.

17    And then, finally, the discretion the courts are

18    afforded under 3553.

19          MR. FOREMAN:  Exactly.  I think we're on the

20    same wavelength --

21          THE COURT:  Good.

22          MR. FOREMAN:  -- on this.  And my only comment,

23    then I'll move on, is that it was clear to me, and I

24    think the letter of the plea agreement is there for your

25    inspection, that the government intended to recommend

1  that the appropriate sentence be 51 months.  And no

2  matter how they got there, whether you applied the

3  terrorism enhancement and then they got 15 levels or

4  however many it was as a downward departure under 5K1.1,

5  or whether or not they got there another way, they

6  intended to recommend 51 months to the court.

7      My only point is that that's the plea

8  agreement.  And the other part of the plea agreement is

9  that we were free to argue to the court why something

10 less than 51 months was the appropriate sentence in the

11 case without doing violence to the plea agreement.

12      THE COURT:  And you did, and I -- and so in

13 listening, imposed a lesser term than was requested by

14 the government.  So that's where we were when we left

15 last, so --

16      MR. FOREMAN:  So now let me turn my attention

17 to some legal arguments as to why the proposed upward

18 departure should not be imposed in this particular case.

19 And if I may, Your Honor, I'm going to make reference to

20 a few cases, and I've taken the liberty to just make a

21 set for you.

22      THE COURT:  Perfect.

23      MR. FOREMAN:  And I've already provided those

24 to Mr. Ray.  And they are kind of in an order according

25 to how I anticipate referring to them today, not that I

1   expect you to digest them necessarily on the spot.

2              I guess I would start with the idea that when

3   we went back in -- following our hearing on May 31st and

4   started taking a look at 5K2.0, and I'm drawing now a

5   quote from the commentary under the background section

6   of that, I offer this:  Departures were never intended

7   to permit sentencing courts to substitute their policy

8   judgments for those of Congress and the Sentencing

9   Commission, direct quote out of the commentary.

10             And I do submit --

11             THE COURT:  I have to -- I'm just going to tell

12  you, one of the things I am -- I am just a bit concerned

13  about at the moment is I think you handed me eight

14  cases, which -- some of which are familiar to me.  And

15  everybody has known we've had this date set for some

16  period of time, like, many weeks.  And I waited,

17  anticipating additional memos, which I think I have

18  something from the government, as I recall.  And I went

19  back through all my original materials, but I would have

20  appreciated the courtesy if you have legal arguments

21  that you are going to be making in references to cases,

22  not only that I would have the chance to take a look at

23  it ahead of time and come in here with my summaries of

24  the cases, but also that the government be prepared to

25  respond with your -- to the cases.

1          MR. FOREMAN:  I certainly meant no disrespect

2     to either you or the government.

3          THE COURT:  I know that.  I'm not -- I'm just

4     saying that if your goal is to get a sentencing done

5     today, you might not be getting it because I don't --

6     I've taken as much time as I've needed, and tried to be

7     prepared when we came in to do the work and be done, and

8     kind of get finality.  But when I don't feel that I'm

9     perfectly prepared and have looked all around at all the

10    cases, and the other side has not had a fair chance to

11    go back and say, these three cases are totally off

12    point, and here is what we argue, and here is something

13    else you should look at, particularly in the context of

14    something as important as this, the people who I can

15    tell are here from distances because we've been here

16    before, will have to return, because I am not going to

17    go forward on something that is as important as this

18    without giving the other side a chance to look at the

19    cases and respond, nor really feel fully prepared to

20    make a decision.  If you want me to do something

21    different, work me -- or if you're just bypassing me and

22    making your record for the Ninth Circuit, which is fine,

23    but if you wanted to be persuasive today, I would have

24    appreciated something in writing.

25          MR. FOREMAN:  Again, my apologies for the

1    oversight.  And, obviously, both you and the government

2    need to be comfortable that you've made -- you're

3    adequately prepared, and I apologize.

4             THE COURT:  It's not as if we haven't had a

5    minimum amount of paper filed by everybody in this case.

6    I don't necessarily need more.  But if you were going to

7    hand me eight cases today, it would tell me that you've

8    read them, and thought about them, and you had a theory,

9    that you might have put it in writing to give us a heads

10   up, in fairness, so that people could be prepared.

11            MR. FOREMAN:  Understood, Your Honor.

12            THE COURT:  So how do we want to proceed?  Why

13   don't you talk with Mr. Ray and your local counsel, and

14   Mr. Engdall and just have a discussion about where we're

15   headed.

16            MR. FOREMAN:  Okay.

17            THE COURT:  I'm just going to step off the

18   bench.

19            (Recess:  2:17 until 3:26 p.m.)

20            THE COURT:  I would note we've taken, gosh,

21   what, an hour?  Is that a fair summary of time?  And

22   Mr. Ray, you and Mr. Engdall, have read the cases that

23   have been provided, is that correct, and had a chance to

24   talk with counsel?

25            MR. RAY:  Yes, Your Honor.

1           THE COURT:  And are you prepared to proceed?

2           MR. RAY:  We are.

3           THE COURT:  And I have, as well, gone through

4    the cases and read -- I think there is really only one

5    I'm not really familiar with, is that fair?  I mean,

6    that's my reading of looking through everything.  And I

7    read the one I hadn't seen before.

8           MR. FOREMAN:  Your Honor, first of all, my

9    apologies again to Mr. Engdall and Mr. Ray and to the

10   court for this delay.

11          I think the Seventh Circuit case is the only

12   one that -- I will cite to some others but, frankly, I

13   don't think they stand for anything approaching a novel

14   premise of law.  They simply stand for, hopefully,

15   support for the argument that I'm advancing to you, but

16   there is nothing new in them.

17          THE COURT:  Okay.  Yeah, but it was important

18   to take the time to read the case.

19          MR. FOREMAN:  I agree.

20          THE COURT:  Thank you.

21          MR. FOREMAN:  I agree.  Picking up, Your Honor,

22   where I was, and the argument that I want to make about

23   the inapplicability of the upward departure that the

24   court proposes to do has two kind of pieces to it.  One

25   of them is that, as I indicated, I don't think it should

1   be applied at all.  And the second part, of which I
2   hadn't gotten to yet, is that if it is to be applied, I
3   don't think it should be applied in as dramatic a
4   fashion in terms of how much you apply it, as you have
5   proposed to do.

6              I had cited to a section out of the commentary,
7   out of the background commentary to Section 5K2.0.  And,
8   basically -- it basically said -- and this is a quote,
9   departures were never intended to permit sentencing
10  courts to substitute their policy judgments for those of
11  the Congress and the Sentencing Commission.

12             And the -- it is my submission, Your Honor,
13  that that's what the proposed departure does, is it
14  suggests that there is a basis for an upward departure
15  that I am not here to argue against.

16             I think the court correctly found that the
17  proposed terrorism enhancement to this defendant and
18  these events didn't apply under 3A1.4.  But I do know
19  that you have made statements in other sentencings, and
20  I, frankly, think in ours, too, to the effect that you
21  didn't see -- necessarily think that using intimidation
22  or arson as a tool to target private companies should
23  necessarily be treated much differently than if it
24  had -- were the government that were involved.

25             My view is that both the Congress and the

1    Sentencing Commission had expressly passed upon which
2    kind of defendants -- which defendants should receive a
3    terrorism enhancement and, importantly, which should
4    not.  And when they specifically defined -- when
5    Congress specifically defined a federal crime of
6    terrorism, and then directed the Sentencing Commission
7    to amend the guidelines to include those which
8    qualified, it was a congressional directive to the
9    effect that it should exclude those that did not meet
10   the federal crime of terrorism.  And to the degree that
11   they excluded people whose objective was to intimidate
12   private citizens, I submit that this court should not
13   use its own judgment to, in essence, step in place of
14   that congressional determination.

15            I was going to suggest that that may be a,
16   quote, forbidden ground within the meaning of the case
17   law.  Frankly, I think that's stepping too far with the
18   way I read the cases.  I think a forbidden ground are
19   things that are expressly identified as being improper
20   for departures in the sentencing guidelines, so for
21   instance --

22            THE COURT:  I'm going to suggest that our --
23   the government will argue their position, but I've
24   looked at this and looked at this and looked at this,
25   but in the context of this particular conspiracy, under

1    the whole broad approach to what the intents, the

2    motives, and the goals of the conspiracy were, that they

3    used direct means against government and indirect means

4    through the private sector to achieve the same goals.

5    And that's -- in many respects, it's -- it would be --

6    and that's what I've stated in my sentencings, unfair to

7    deviate wildly in the sentencings when the overall and

8    overarching goals of the conspiracy, the intent,

9    purpose, and design, and effect, were more direct --

10   directly against government and indirectly with the same

11   goals against the private sector.

12          And I am -- I don't think it's in the forbidden

13   grounds.  I think -- I appreciate the Seventh Circuit's

14   approach, but I'm going to tell you that I have made

15   this as a fundamental ruling in these cases.

16          I do appreciate your argument.  And I'm happy

17   to hear things further, but in the context of how I

18   looked at this, you need to talk about that, because

19   it's just -- it's the elephant in the room.

20          MR. FOREMAN:  And, you know, I do understand,

21   Your Honor, that if you were to look at the conspiracy

22   or the conspirators as a group or as a whole, I mean,

23   one could fairly state that as set forth in the

24   conspiracy count, what they had in their minds

25   collectively was to influence somebody.  I appreciate

1   the point.

2            THE COURT:   Uh-huh.

3            MR. FOREMAN:   Now, I suggest, however, that the

4   distinction that the law recognizes is that when you

5   carve back and you try to analyze what a particular

6   defendant did, you -- they are not necessarily charged

7   with all the actions of their coconspirators.  They are

8   charged with those that occurred while they were part of

9   the conspiracy, and perhaps those in which they

10  otherwise indicated that they had some sort of approval.

11           In Ms. Tankersley's case, she was part of the

12  conspiracy for a relatively short period of time.  And

13  the only actions that she personally engaged in,

14  regardless of anybody else, were actions that involved

15  private industry.

16           By 1999, she had left and she had departed the

17  venue.  She was in northern California and later in

18  Arizona.  And as a practical matter, I don't think the

19  law allows you to infer that she had an objective that

20  somebody else may have had before she joined the

21  conspiracy or that somebody else may have had after she

22  left.

23           And so in a peculiar sense, I think that on

24  some level, the law requires a distinction be drawn

25  between those people whose crimes, whose participation,

1  whose personal activities in furtherance of the

2  conspiracy, support a terrorism enhancement from those

3  who do not.  It's the position that I'm urging here

4  today, and I know it's different from the position that

5  you've taken, but I would be --

6          THE COURT:  I'm happy to have you make it,

7  that's fine.

8          MR. FOREMAN:  Well, I don't want to just beat a

9  dead horse here.  And I do understand -- I've read your

10  thinking, Your Honor, and I'm not --

11          THE COURT:  Well, have you read the opinion we

12  handed out initially to give guidance in this particular

13  case?

14          MR. FOREMAN:  The one having to do with the

15  terrorism enhancement?

16          THE COURT:  Right.

17          MR. FOREMAN:  Of course.  Cover to cover.  And

18  all I'm saying is that when I go back and I do the

19  research that sort of talks about how sentences are to

20  be tailored in one case or another, I say that the

21  terrorism enhancement has meaning.  And for those people

22  who qualify for the terrorism enhancement, I'm not

23  quarreling with what the court did.  You found that we

24  don't.

25          THE COURT:  Right.

1        MR. FOREMAN:   And because of that fact, I think
2   it leaves open the idea of whether or not it's
3   appropriate for this court to get to much the same place
4   a different way.

5        And without previewing the Seventh Circuit
6   decision, you can anticipate my argument is going to be
7   that you shouldn't, because you are either in or you are
8   out.   And in this situation, my position is that if you
9   are not involved in a federal crime of terrorism, then
10  you have to look at arson.   And you have to look at the
11  heartland of cases for arson.   And then you have to
12  decide whether or not there is a basis for an upward
13  departure that doesn't amount to substituting the
14  court's judgment for the Sentencing Commission or the
15  Congress in defining who should be there, or whether or
16  not it's appropriate for you to get there through a back
17  door.

18       And the argument that I'm here to try to
19  advance to you today, hopefully, is that under the
20  circumstances of the case law as it exists today, that
21  my argument is the correct one, and that she isn't
22  subject to the enhancement at all.

23       I would also just kind of point out that one of
24  the things that you commented on in terms of the import
25  of the -- of the communique, and I am mostly focusing on

1    the communique in this case, is that the Ninth Circuit
2    has held that upward departure should not be based on a
3    perceived harm that is either speculative or unduly
4    attenuated.

5           Now, in this case, the evidence that's before
6    you in this particular sentencing has to do with
7    Mr. Bramwell's reaction, among other things, to the
8    arson that occurred in front of him.  And I have cited
9    to you a case, the Dayea case, which I'm sure you're
10   familiar with, for the proposition that there are
11   circumstances where the perceived harm justifying an
12   upward departure is too remote or too speculative.

13          And in that situation, there was a suggestion
14   that the death of a particular police officer had an
15   impact upon other police officers in the performance of
16   their professional functions.  And I just point out that
17   on that one that it was -- that decision was reversed.

18          Now, let me just turn away from the per se
19   application of the upward enhancement and talk a little
20   bit about the scope of the upward enhancement.  Twelve
21   levels is what the court has proposed to do in this
22   particular case.  And I would submit that that is a
23   dramatic -- would have a dramatic impact upon the
24   sentence in this case, and that it is too much, even if
25   one accepts the fact that the court has the authority to

1   impose some sort of an upward departure.  And I've cited

2   to the *Roston* case, which sort of stands for the

3   proposition that at seven levels you got to look very

4   carefully before you can use it.  And, you know, I've

5   tried to find a way to frame this that is, hopefully,

6   intellectually honest.

7          The -- I thought of trying to sort of take a

8   look at what the court did and said, well, what happens

9   if you just subtract 12 levels out of that?  I suggested

10  that in my papers, and then in my later papers, I kind

11  of said, ah, I'm not so sure about that.  And what that

12  would do is it would have the impact, if you did it, of

13  reducing the sentencing range from something to -- a

14  level of 8 to 14 months, it'd become a Class C offense.

15  And the difficulty with that approach, by my lights, is

16  that it would -- it requires that the government's

17  concession as to a 5K1.1 reduction stand, and then you

18  subtract 12 levels off, and you get to a point where I'm

19  not sure that I can pass the straight-face test in terms

20  of that kind of argument.  So I go back --

21          THE COURT:  It's been tried as well.

22          MR. FOREMAN:  But not by me.

23          THE COURT:  No, it hasn't.

24          MR. FOREMAN:  Okay.  But the -- but I think the

25  place where I come back to, where I'm more comfortable,

1  and I think is a more principled place, is if you start

2  with the premise that we try to figure out what the

3  appropriate guideline calculation is for an arson --

4          THE COURT:   Well, let's talk about Mr. Ray's

5  alternative, starting with a minimum mandatory 60 months

6  and going down from there.

7          MR. FOREMAN:   I don't think it matters, because

8  once the government makes a recommendation that says the

9  mandatory minimum is not to be binding upon the court,

10  and regardless of whether you start at 60 or whether you

11  start at -- I don't even remember the number -- 78 maybe

12  it was, under the other analysis, once the government

13  concedes that the mandatory minimum is no longer

14  binding, and shouldn't -- and that a sentence should be

15  imposed below the mandatory minimum, that this court has

16  the authority to decide what the appropriate sentence

17  should be that meets the factors under 3553.

18          And so even if he wanted to start at the 60 and

19  immediately says that from the 60 we're going to take

20  off, I guess it would be two levels, in order to get to

21  51 months, the bottom line is he has recommended to the

22  court a sentence below the mandatory minimum, and we

23  don't have to talk about it anymore.

24          THE COURT:   Right.  Which he did in conjunction

25  with the plea agreement that he entered into that gave

1    the court that recommendation.

2              MR. FOREMAN:  Yes.

3              THE COURT:  Right.  And that the court departed

4    further.

5              MR. FOREMAN:  Yes.  Which the court I believe

6    had the authority to do.  But the point that I'm trying

7    to make is that with the mandatory minimum no longer

8    defining the court's floor, then I think the appropriate

9    analysis is to go back and do a sentencing guideline

10   calculation, without regard to it.  And that's what the

11   Probation Department did, before we got to the 12-level

12   issue, and before we got to the 5K1.1 issue.

13   Essentially what it did is it calculated it on the basis

14   of the total offense conduct, in terms of picking up the

15   relevant conduct and the total loss, it added more than

16   minimal planning, it subtracted acceptance of

17   responsibility, it gave a two-point reduction, not a

18   four-point reduction, for role in the offense, and that

19   becomes the baseline calculation that I think is

20   appropriate.  And that's what I'm arguing for.

21              And so if you start with the idea that you were

22   going to do some sort of upward enhancement, I think you

23   start --

24              THE COURT:  And that was presumptive 24 to

25   30 months?

1              MR. FOREMAN:  Yes, exactly.  And that becomes

2     what I urge the court to find is the heartland of cases

3     of arson in which we're not dealing with a mandatory

4     minimum.

5              And so if that analysis is correct, then I'm

6     saying that that -- that if you -- that's the point that

7     you work off in terms of trying to figure out what the

8     appropriate case is.

9              I'm not going to talk about the *Leahy* case,

10    because you can sort of see it standing there for a

11    proposition that's obviously favorable to us, which

12    suggests, by analogy, that if there is an attempt to

13    suggest that there be an enhancement under another

14    provision that is intended to get you close to a

15    terrorism enhancement, you can't do it because the

16    offense doesn't qualify.  And I submit that that's where

17    we're at here.

18             So what can you do?  Well, I've tried to look

19    at the case law, and the ones that I've sort of cited to

20    you, and there is certainly a lot of them, I think that

21    the Ninth Circuit seems to allow two- to four-level

22    upward adjustment without even blinking, is the sense

23    that I've got of it.

24             Anything above that is a little different.  In

25    the *Nagra* case that I presented you with, I'm sure you

 1   are familiar, they reversed on a six-level upward.

 2   They, actually, in the *Matthews* case reversed on a four

 3   level, although there are cases that uphold the four

 4   level.

 5          THE COURT:  So do the calculations for me.  Say

 6   you take the presumptive sentencing range as the

 7   calculation was made, 24 to 30 months, and you add two

 8   levels, what's the range?

 9          MR. FOREMAN:  Well, I don't have it in front of

10   me.  My --

11          THE COURT:  Well, take a minute and ask

12   Mr. Walker or find out and tell me what it is.

13          MR. FOREMAN:  Okay.  Do you have the book?

14   Thirty to thirty-seven.

15          THE COURT:  For a two level.

16          MR. FOREMAN:  For the two level.

17          THE COURT:  What's the four level?

18          MR. FOREMAN:  Thirty-seven to forty-six.

19          THE COURT:  Thirty-seven to forty-six.  And a

20   two level is what again, 31 to --

21          MR. FOREMAN:  Thirty to --

22          THE COURT:  Thirty to thirty-six.  Okay.  Which

23   I would point out, I imposed a 46-month sentence.

24          MR. FOREMAN:  I do know that, Your Honor.

25   And -- I mean -- but the problem that we're starting

1   with is you get to a 46-month sentence only because the

2   government starts at a number that is extraordinarily

3   high and irrelevant.

4           THE COURT:  What number do they start at?

5           MR. FOREMAN:  Fifty-one.  That's their

6   recommendation coming in.  And it seems to me that the

7   appropriate thing to do is you have to start with the

8   idea that the 5K1.1 assistance, which they have

9   stipulated as part of the plea bargain, it means

10  something.  All I'm saying to you is that I thought it

11  was unfair of me to make an argument that started with

12  where they started and then required you to subtract 12

13  levels out.  It just didn't strike me as being

14  intellectually honest.  So I can say, forget all of

15  that, and instead go to the heartland of sentences for

16  arson, and impose a sentence within 24 to 30 months.

17  That is the heartland of what I submit should be the

18  appropriate sentence in this case.

19          At the end of the day, we go back to 3553.  At

20  the end of the day, you took the government's

21  recommendation of 51, and you came down another level.

22  And one of the -- the problems that I've, I guess, got

23  as I sort of analyzed where we were the last time, and

24  I'm prepared to write it off to kind of a failure of

25  advocacy on my part, is that when I look at how other

1    people were sentenced in this case, and what kind of

2    other considerations the court was willing to give, I am

3    surprised that Ms. Tankersley fell where she was.

4         I took a look at the average reduction below

5    government recommendations that you imposed, and I'm

6    going to set Thurston aside, for everybody other than

7    Kendall -- Ms. Tankersley, of those people who

8    cooperated, and the average reduction was 18 months

9    below the government's recommendation.  Some were

10   higher.  Some were lower.  But the average was a little

11   bit -- 18 months below the government's recommendation.

12        THE COURT:  You would acknowledge that some of

13   those sentences were substantially longer?

14        MR. FOREMAN:  Oh, absolutely.

15        THE COURT:  So 18 months is proportional to the

16   period of time they were receiving as if -- if you took

17   it as a factor of --

18        MR. FOREMAN:  It -- if you measured it against

19   the overall sentence that the government recommended,

20   then I understand how you got to the number.  But you

21   didn't get there in our case.  Across the board, you

22   were generally recommending -- it looked to me like

23   about 10 percent below the government's number.  And the

24   idea of talking about it in terms of two levels or one

25   level, I don't care about levels.  I care about months.

```
 1   And so from a perspective in terms of how I think about
 2   these things, I need to put that on the table, too.
 3             THE COURT:   That's why I sent you over to the
 4   book, because you were talking in terms of levels, and I
 5   talk in terms of months.  I get to the -- I know the
 6   levels, but I want to know what the months are.  So I do
 7   the same thing.  But for proportionality, you solve for
 8   X, 181 months --
 9             MR. FOREMAN:   Eighteen off.
10             THE COURT:   -- 18 off is a percentage of what?
11   51 months, level off, 41 is that -- so you solve for X.
12             MR. FOREMAN:   Savoie --
13             THE COURT:   You want to do it as a
14   mathematical -- but you know what, none of this -- we're
15   going to do the calculations, but, truly, a sentencing,
16   as I have said over and over again is about
17   accountability and hope.  So I'm not disagreeing with
18   you on many levels.  I understand.  And we're here
19   because the government could have stood by its plea
20   agreement, just come into court on a straight
21   sentencing, but the government had the choice, and did
22   take the choice, to ask for the enhancement.
23             And when the enhancement was then asked for in
24   the context of this entire group of defendants, you
25   could only imagine the range of sentencings if there
```

1    wasn't an acknowledgement and a respected

2    proportionality of this sentence as between and among

3    the defendants.

4          MR. FOREMAN:  It's not that I don't accept that

5    there is a relationship between the reductions that you

6    gave and the length of the sentences that were otherwise

7    being faced by these people.  However, I will say by way

8    of example that of all of the people who cooperated, we

9    were the only one who didn't get a two-level reduction.

10          THE COURT:  And that's actually one of your

11    better arguments, and one I was prepared to deal with

12    today.

13          MR. FOREMAN:  Okay.  Well, then, I'll leave

14    that one alone.

15          THE COURT:  Okay.  Or you might underscore it,

16    because, very frankly, I'm -- you know, I've looked at

17    every -- I look at these things, and I've looked at them

18    all the way through, and I've thought a lot about this

19    one.  And if you could see the notes I have up here, I'm

20    actually inclined to give her another level.  And that's

21    where I was headed.  And the arguments aside, and you

22    can make them all to the Ninth Circuit, I'm happy to

23    have you do it, I think they're going to get all ten of

24    these, they're going to wrestle with them all the way

25    around, in terms of what the goals of sentencing are,

1     but, frankly, I was prepared to go ahead and do that.

2     I'm going to tell you that straight up.

3           MR. FOREMAN:  Well, I'm going -- you know, I've

4     taken a lot of time here, and part of it is clearly my

5     fault in not bringing the case law to your attention

6     ahead of time, and, again, I apologize for that.  But

7     you've heard the arguments that I have to make.

8           I mean, what I tried to do is I try to find an

9     intellectually solid place to start.  And the argument

10    that I'm here to make to you is that because of all the

11    factors I've talked about today, I think the appropriate

12    sentence for this woman is in the 24- to 30-month range,

13    which I think is the heartland of charges -- of arson

14    charges for which we're not dealing with a mandatory

15    minimum.

16          You've heard the argument, I'm not going to

17    just restate it over and over again.  It's not what I

18    like to do.

19          The only other thing that I want the court to

20    be aware of, and I hope you got a hold of, I think it's

21    Exhibit 101, one of the things that you suggested --

22          THE COURT:  No.  I read her letter.  She has a

23    copy of the letter that she read -- the letter to --

24    that she wrote to Jerry Bramwell and copy of the --

25          MR. FOREMAN:  Right, good.

```
 1                THE COURT:  -- statement that she read in
 2    court.
 3                MR. FOREMAN:  Exactly.
 4                THE COURT:  I appreciate that.
 5                MR. FOREMAN:  I just wanted to make sure
 6    that --
 7                THE COURT:  And I believe he's still sitting
 8    over there.  Who is the --
 9                MR. RAY:  No.
10                MR. FOREMAN:  He left right after his
11    testimony.
12                MR. ENGDALL:  That's Darwin Baker, Your Honor,
13    FBI.
14                THE COURT:  Oh, okay.  Because I remember that
15    Mr. Bramwell sat over in that corner --
16                MR. FOREMAN:  That's right.
17                THE COURT:  -- but he did leave --
18                MR. FOREMAN:  Right after his testimony.
19                THE COURT: -- right after his testimony.
20                MR. FOREMAN:  But I don't need to -- I just
21    want to make sure that you were aware of that, when you
22    start thinking about where we are and where we've been.
23                I don't have anything more to urge of you
24    today.  And, again, as I said at the start, I thank you
25    for the opportunity to speak to you.
```

```
 1            THE COURT:  No, you know, I appreciate -- I
 2  would have been appreciative to have your thoughts on
 3  this and the analysis and the thought about the cases or
 4  at this juncture to see what the Seventh Circuit has
 5  done.  No, I think people have done really good
 6  lawyering.  It would have been nice to have everybody up
 7  to speed, because we all try to get ready and
 8  prepared --
 9            MR. FOREMAN:  Of course.
10            THE COURT:   -- and we want to use our time
11  wisely.
12            MR. FOREMAN:  Of course.  Thank you, Your
13  Honor.
14            THE COURT:  Mr. Ray.
15            MR. RAY:  Thank you, Your Honor.  I appreciate
16  what the court said.  I'm not giving up.
17            THE COURT:  But, in fairness, I thought I
18  better signal where I was headed.
19            MR. RAY:  I appreciate that.
20            THE COURT:  Uh-huh.
21            MR. RAY:  I also want the court to know that
22  occasionally we, and the court, deal with out-of-
23  district attorneys, sometimes those experiences are not
24  always pleasant, and it may simply be a matter of the
25  person not knowing the practices of this court.
```

1      In every respect, Mr. Foreman and I have had
2  nothing but the finest of dealings.  He's been
3  straightforward, completely ethical, and a formidable
4  advocate, but always a consummate gentleman, and I would
5  like the court just to know that.

6      THE COURT:  I -- that's a given.  And I
7  appreciate it.  It would have been just nice to have
8  that and --

9      MR. RAY:  Sure.

10      THE COURT:  But at the same time, I was simply
11  going to take the time to go read it whether -- and I
12  want to read --

13      MR. RAY:  Of course.

14      THE COURT:  -- everything.  I'd rather read it
15  before I have to listen to arguments.  And if you hadn't
16  read it and needed the time, I'd rather do it this way.

17      MR. RAY:  I appreciate that.  I did have the
18  opportunity to go over it, as did Mr. Engdall.  I won't
19  speak long at all.

20      I just want to respond to two points that
21  Mr. Foreman raised.  The first is the departure
22  argument, and, in particular, the Leahy case out of the
23  Seventh Circuit, which the court has read.  I would --
24  it's an interesting case.  And I have great respect for
25  that circuit and its holdings.  I would point out to the

1    court several things.

2           First, that, of course, it is a Seventh Circuit

3    and it's not controlling.

4           Second, that the thrust of that case is the

5    extent of the departure and not the departure itself.

6    They upheld the departure.

7           Third, unlike Leahy who the court said

8    threatened to use the toxin, Ms. Tankersley, in this

9    case, committed the arson.

10          Fourth, Ms. Tankersley, in the attempted arson,

11   utilized a destructive device, which, had it been

12   charged, and she had pled to it or been convicted of it,

13   would have subjected her to 360 months consecutive to

14   the arson.   That takes her out of the heartland that

15   Mr. Foreman is referring to.

16          And then, finally, it's a pre-*Booker* case.

17   Post-*Booker*, the court can do whatever it deems

18   appropriate as long as the sentence is reasonable in

19   terms of departures.   That's all I'm going to say about

20   that area.

21          I want to respond briefly to the

22   proportionality argument, which I did -- I chose not to

23   object, I think, arguably it is beyond the scope of the

24   limitations placed on this hearing, nevertheless, I will

25   counter with these bullets.

1          First of all, I'm confident that there is not a
2   single person that's attended these hearings that would
3   not say or agree that this court has been remarkably
4   attentive in all 10 of the sentencing hearings,
5   actually, 12 if you count Mr. Paul's 2 and
6   Ms. Tankersley's 2.
7          On May 31st, when this court sentenced
8   Ms. Tankersley, this court was well aware, of course, of
9   the previous sentences that it had imposed in the Back-
10  fire -- against the Backfire defendants, because those
11  sentences had occurred previous to Ms. Tankersley.  It
12  was also aware of the parties' recommendations to be
13  made in the subsequent sentencings.
14         On May 31st, and certainly today, the end of
15  these proceedings, no one knows this case better than
16  Your Honor.
17         You chose to not follow the government's
18  recommendation of 51 months, and impose a sentence of
19  46 months.  And you did that for good reason, because in
20  the previous sentences, you had not followed the
21  government's recommendation, you had gone below the
22  government's recommendation in every instance.
23         And in sentencing Ms. Tankersley, you
24  appropriately considered those cases -- those other
25  sentences and the proportionality of Ms. Tankersley's

1    sentence in relation to those cases.

2           Mr. Foreman mentions the Thurston sentencing as
3    a basis for a disproportional argument in
4    Ms. Tankersley's case.  As the court hinted, that's an
5    apples and oranges argument.  Mr. Thurston was a minor
6    player in a single arson, and his participation was only
7    involved in the animal release.

8           Mr. Thurston also gave extraordinary
9    information and very, very valuable information to the
10   government, which was taken into consideration in
11   formulating the government's recommendation of
12   37 months, which is what the court imposed in that case.

13          The two defendants, Backfire defendants, who
14   are most closely related in terms of culpability are
15   Ms. Tankersley and Ms. Savoie.  The court departed two
16   levels further in Ms. Savoie's case from the
17   government's recommendation of 63 months to 51 months,
18   and in Ms. Tankersley's case departed one level further
19   from 51 months to 46 months.

20          The slightly lower reduction is entirely
21   justified on the basis that Ms. Tankersley was involved
22   in three arsons, not two like Ms. Savoie, on the basis
23   that Ms. Savoie was -- turned herself in as soon as she
24   found out that an arrest warrant was out for her.  And,
25   unlike Ms. Savoie, Ms. Tankersley in her early youth,

1  not that long ago, was an outspoken advocate of property
2  destruction as a form of protest.
3          I understand what the court has said earlier,
4  and I appreciate that.  But the court's imposition of a
5  46-month sentence in this case, I would submit, was
6  appropriate, was not disproportionate, afforded
7  accountability, hope, and should be reimposed.  Thank
8  you.
9          MR. FOREMAN:  I'll be honest, I still don't
10  understand the distinction that he draws with Thurston.
11  I understand that Thurston was involved in one
12  substantive offense that was -- and that is a
13  distinction.  On the other hand, as I outlined in my
14  earlier arguments, it appears to me that he was
15  associated with the conspiracy for a much longer period
16  of time, and he performed actions in furtherance of
17  other arsons having to do with these communiques, I just
18  don't know how many, at least three or four.  So I'm not
19  sure there is anything to pick between there, to be
20  honest.
21          But I have appreciated the opportunity to speak
22  to you today, and I don't have anything more to add.
23          THE COURT:  Ms. Tankersley, I know you've read
24  the presentence report, and I know you've read all the
25  documents in this case.  Have you had plenty of time to

1  talk all of it over with your lawyers?

2          THE DEFENDANT:  Yes, Your Honor.

3          THE COURT:  And do you have any other additions

4  or corrections you want to call the court's attention

5  to?

6          THE DEFENDANT:  No, Your Honor.

7          THE COURT:  I'd be happy to hear anything else

8  you want to tell me.

9          THE DEFENDANT:  I feel like the statement that

10 I had prepared and read before comes from my heart and

11 is how I feel.  And I have spoken out in the -- over the

12 last nine years against this type of actions in my

13 community and will continue to do so.  And you have

14 that, so I'll just let that statement stand.

15         THE COURT:  First, I will accept, and I

16 appreciate everybody's work on getting the right party

17 and the right figure for restitution, and it would

18 appear that the number of $983,615.19 (sic) apportioned

19 between Zurich and U.S.F.I. Holdings is the appropriate

20 designation for the respective restitution amounts.

21         MR. RAY:  I think it was --

22         THE COURT:  $100,000 goes to U.S.F.I. Holdings,

23 and $883,615.99.  We add those up, it's 983,615.99 is

24 the total.

25         MR. RAY:  Right.  And just so, I think, in

1  fairness, if the court imposes that restitution in this
2  case, it probably should go back and change the
3  restitution figure in Mr. Tubbs' case accordingly.  And
4  the difference is $6,604.01.

5          THE COURT:  Ms. King will be delighted to do
6  that.

7          And I appreciate -- I guess one of the reasons
8  I was asking a number of questions is that the defendant
9  that I just finished with before this case, he was able
10  to negotiate a substantial, satisfactory result in the
11  final figure of $250,000.  And it would appear to this
12  court that that may be a possibility in this case for a
13  variety of standpoints.  And so to the extent that the
14  court can assist in that or pay attention, I would like
15  to do that, because, again --

16          MR. FOREMAN:  That's certainly our intention,
17  Your Honor, and we were aware of it as well.  And we
18  just haven't done it yet.  And at the point where we
19  have a proposal to make to the court, we will present it
20  for your approval.

21          THE COURT:  Okay.  You know, I'm going to go
22  through it, I have to make my record as well --

23          MR. FOREMAN:  I understand.

24          THE COURT:  -- and go through my calculations.
25  And, trust me, I think we're all looking forward to a

1    day when this isn't the majority topic of our

2    conversation in our office.  But be that as it may, I'm

3    going to go through what I need to say, and then I'm

4    going to talk about today, and why today I'm going to do

5    what I'm going to do.

6             The court agreed to reopen the defendant's

7    sentencing for the purpose of allowing the defendant the

8    opportunity to present argument that a 12-level upward

9    departure was not appropriate.

10            Having given Ms. Tankersley that opportunity,

11   I'm going to address the arguments as follows:

12   Essentially, the way I read it, you maintain that the

13   sentence of 46 months is disproportionately severe when

14   compared with the sentences received by other

15   coconspirators.

16            You also assert that other defendants received

17   a greater reduction from the government's recommended

18   sentence than Ms. Tankersley, even those who refused to

19   cooperate fully with the government.

20            Further, you rely on the fact that other

21   defendants, including those who were convicted of

22   offenses that were subject to the terrorism enhancement

23   under 3A1.4 were given greater reductions in their

24   sentences.  And that the suggestion is by the defendant

25   that an upward departure is not warranted in this case

1   at all.

2          So after reviewing your presentence report, the
3   sentencing memorandum prior to the sentencing hearing, I
4   decided, as I did in every other coconspirator's case,
5   that I would upwardly depart to the offense level that
6   would have applied if the offenses of conviction had
7   qualified for the 3A1.4 enhancement.

8          Indeed, I found that it would not be fair or
9   reasonable if some coconspirators received a 12-level
10  enhancement under 3A1.4 while others did not simply
11  because they targeted the conduct of private individuals
12  rather than government.

13         I think I alluded in the colloquy I had with
14  counsel that in the context of this particular case, I
15  think it's an indirect and direct relationship, and
16  that's just a factor that in attempting to be fair and
17  provide substantially similar sentences in this
18  particular case, I have consistently followed as an
19  analysis.  And I'm going to follow it in this case.

20         So the purposes of the conspiracy, the means,
21  motives, intents, and actions to carry out those
22  purposes were the same and should be treated similarly.

23         At the same time, I have looked at each
24  individual case to determine the level of downward
25  departure, if any.  And I have done that as appropriate,

1    again, in each particular case.

2           Further, I have not departed downward more than

3    two levels in any case, even those defendants who

4    provided assistance to the government at great cost to

5    them personally.

6           For those defendants whose offense levels were

7    significantly greater, such as Mr. Meyerhoff, Mr. Tubbs,

8    and Ms. Gerlach, a departure of one or two levels

9    resulted in a proportionately larger reduction in

10   sentence than for a defendant with a lower offense

11   level, such as Ms. Tankersley. The departure reflected

12   the proportionality that is recognized by the

13   guidelines.

14          As the defendant points out that other

15   defendants, such as Mr. Tubbs, received only one level

16   upward departure, I explained the reasoning behind this

17   decision at Mr. Paul's sentencing on Wednesday, however,

18   for the benefit of defense counsel who were not present,

19   I do so again, or for those who have heard it before,

20   please bear with me.

21          My intent in Mr. Tubbs' case, as in all of

22   these cases, was to upwardly depart so that the

23   resulting offense level was the same as if the 3A1.4

24   enhancement had applied. In Mr. Tubbs' case, I found

25   that the enhancement applied to some offenses but not to

1 others, including Cavel West, and applied the 12-level
2 enhancement to each qualifying offense as a Chapter 3
3 adjustment under the guidelines. I did not impose the
4 5K2.0 upward departure to each of the nonqualifying
5 offenses at the same stage of the guideline calculations
6 because the upward, and I might add the downward,
7 departures are Chapter 5 adjustments that are intended
8 to be imposed at the final stages of the guidelines
9 calculations.

10      Proceeding with the calculations, I determined
11 the multiple count adjustment for Mr. Tubbs' offenses
12 under Guideline 3D1.4, also a Chapter 3 adjustment,
13 which provides a framework for determining the combined
14 offense level for multiple counts. Under that
15 framework, the multiple count adjustment is determined
16 by taking the highest offense level of an offense group
17 and increasing it by a specified amount. In Mr. Tubbs'
18 case, the highest grouped offense was 35, reflecting the
19 12-level enhancement I imposed for Mr. Tubbs' qualifying
20 offenses under Section 3A1.4. The offense levels of the
21 remaining groups totaled four units. And under 3D1.4, I
22 was required to increase the offense level by 4,
23 resulting in a combined offense level of 39.

24      Had I imposed the 12-level upward departure to
25 Mr. Tubbs' offenses that did not qualify under 3A1.4 at

1   the Chapter 3 stage of the guidelines calculations,

2   including the arsons of Cavel West, Childers Meat

3   Company, Superior Lumber, U.S. Forest Industries, and

4   the Burns Wild Horse Corral, the grouped offenses with

5   the highest offense level would have remained 35, but

6   the offense levels of the remaining groups would have

7   totaled 8 units, requiring the court to increase

8   Mr. Tubbs' offense level by 5, resulting in an offense

9   level of 40.

10         However, because an upward departure under

11   5K2.0 occurs at the end of the calculations, I imposed a

12   collective upward departure in Mr. Tubbs' case

13   accordingly.  I did not upward depart 12 levels, because

14   to do so would have increased Mr. Tubbs' offense level

15   11 levels beyond what would have resulted in the 3A1.4

16   enhancement if it had applied to all of his offenses of

17   conviction.

18         Again, my intent in Mr. Tubbs' case, as in all

19   the cases, was to upward depart to the offense level

20   that would have resulted if the 3A1.4 enhancement had

21   applied.  Therefore, I departed upward by one level to

22   reach offense level 40.  The offense level calculations

23   would have been the same had I applied the upward

24   departure to each of Mr. Tubbs' nonqualifying offenses

25   at the Chapter 3 stage of the calculations.

1           Now, unlike Mr. Tubbs, Ms. Tankersley is not

2    subject to a multiple count adjustment under Guideline

3    3D1.  Therefore, to attain the offense level that would

4    have applied under a 3A1.4 enhancement, I upward depart

5    by 12 levels, as I did in several other coconspirators'

6    sentencings, thus I am not treating Ms. Tankersley more

7    severely than Mr. Tubbs or any other coconspirator.  In

8    fact, I am treating them the same.

9           Ms. Tankersley also compares her case to

10   Mr. Thurston who received a 37-month sentence.  Notably,

11   the government's motion for substantial assistance

12   recommended a sentence of 37 months, and I did not

13   depart lower than the recommendation, unlike in

14   Ms. Tankersley's case.  And I think it goes without

15   saying, I'm going -- an aside, Mr. Ray, I think, has

16   placed on the record an evaluation of the decisions that

17   really are part and parcel with this entire set of ten

18   defendants, and that is, they made an individual

19   determination based on quality and quantity of

20   information provided by a particular defendant.  And the

21   choice to even have those discussions, and accordingly

22   made their recommendations to counsel to resolve the

23   particular case within a range afforded them in a plea

24   agreement, and as such, as I told you earlier,

25   oftentimes, the respective attorneys representing the

individual parties know a great deal more about the case and have made evaluations and professional determinations about what convictions and what risks they have in pursuing legal theories and issues, and they make their plea agreements out of a professional evaluation of that information and those judgment calls. And as such, I only know that it was a strong recommendation and a strong statement today that Mr. Thurston cooperated over and above what the government might have hoped for. And they, accordingly, granted him that negotiation at the time of his change of plea.

So I have considered him apples and oranges, and I have had a difficult time in terms of fashioning across-the-board proportionality because I do think his sticks out, but I think the government today has under-scored why and to what degree that that decision was made to make that recommendation.

So as with other defendants who did not receive an enhancement under 3A1.4, I upwardly departed by 12 levels in Mr. Thurston's case based on his intent in targeting the BLM Litchfield Wild Horse Corral for arson.

So I think in listening to your argument, you also complained that Mr. Thurston did not receive a

1    further upward departure for participating in the U.S.
2    Forest Industries communique issued after the arson.
3    However, the 12-level upward departure was not based on
4    the conduct of composing this communique.  It was based
5    on the conduct of committing the arson.

6         The communique is relevant to the extent that
7    it reflects the motives and intent of the arsonists who
8    include Ms. Tankersley.  Moreover, I did not impose an
9    upward departure in any case based on conduct that did
10   not form the offenses of conviction, and that includes
11   Ms. Tankersley's uncharged conduct.

12        Thus, today, I think the real issue is whether
13   the 46-month sentence is reasonable but not greater than
14   necessary in light of all the facts of this case.  And I
15   find that for the reasons I gave at the initial
16   sentencing, that I stated on the record, as well as
17   taking a look at this case in the context of the
18   defendant's cooperation, her substantial withdrawal from
19   the activities, her efforts to become a productive and
20   contributing member of society, her substantial step
21   towards making amends with the victim in this case, and,
22   again, when I look back and I collectively and
23   individually look at each of these cases, across the
24   board, am I satisfied that it's a fair and reasonable
25   sentence under all those circumstances, and taking into

1  account each individual defendant's comments,
2  statements, past actions, changes in behavior, going
3  forward, the goals of sentencing, be it punishment,
4  deterrence, rehabilitation, community safety?  So I
5  don't impose these sentences lightly or without a heavy
6  heart.  It is heartbreaking that so many young and
7  talented and intelligent people will spend years of
8  their lives, some significantly more than others, behind
9  bars.  But the defendants, including Ms. Tankersley,
10  made choices and must bear the consequences of their
11  actions.

12          And like a number of the defendants in this
13  particular case, I frankly fully expect Ms. Tankersley
14  to be not only a contributing member while serving her
15  sentence, and bettering herself, because she certainly
16  has skills and talents and capabilities that far exceed
17  individuals, but that she can give back in those
18  institutions the opportunities that so many people in a
19  position -- you're in a position that other people would
20  just cherish the opportunity to have and to go forward
21  in life.  And in so many ways, as I said earlier in
22  Mr. Paul's sentencing, if they had just part of what you
23  have been given, a loving family, an education,
24  substantial economic wherewithal, the opportunities
25  you've been afforded, many of the people that I see here

1  on a daily basis just wouldn't be in the courtroom. And
2  some are more resilient than others under the worst of
3  circumstances, and some who have everything, have no
4  resiliency, and we see them over and over again. So I
5  expect, frankly, big things from you.

6         I don't think I'll see you again in the
7  courtroom. And I think I will hear positive comments
8  about you while you serve your sentence. And I suspect
9  when you come out and are on court supervision that you
10 will be successful, and you will go on and make a huge
11 contribution to society. I just fully expect that.
12 Just as I looked at a number of these people who appear
13 before me, and I suspect they still haven't learned some
14 lessons, and they will, no doubt, be back in front of
15 another authority figure. It may not be this court. It
16 may be somebody else, but I fully expect them to
17 struggle with decisions they need to make.

18        So, accordingly, I find the following
19 guidelines calculations apply to this offense:

20        In Case Number 06-60071, count 1 through count
21 3, conspiracy, arson, and attempted arson of the U.S.
22 Forest Industries, pursuant to Guideline 3D1.2, count 1
23 through 3 are grouped together for purposes of
24 sentencing. The base offense level for this offense is
25 6, with a 13-level upward adjustment for amount of loss,

1   and 2-level upward adjustment for more than minimal
2   planning.  Based on the recommendations of Probation, I
3   also find a two-level downward adjustment for minor
4   role.  I decline to adjust downward an additional two
5   levels for minimal role.  In this instance, the
6   defendant chose to return to the U.S. Industries after
7   the device did not ignite to ensure that a second arson
8   attempt was successful.

9            And I want to note and underscore the -- there
10  by the grace of a decision-making, had the government
11  chosen to charge you differently, or to pursue an
12  incendiary device, this would be a very different
13  sentencing.  So that's just a factor I take into account
14  in terms of all the factors in placing you where you
15  need to be in this particular calculation.

16           So as I found previously, I do not find the
17  government has established the offense was calculated to
18  retaliate against government conduct, therefore, the
19  base offense level is 19.

20           Now, on the issue of acceptance of
21  responsibility, the agreement of the parties, you will
22  receive the three-level downward adjustment for
23  acceptance of responsibility, resulting in a total
24  offense level of 16.

25           You have no criminal history points, that means

1    your Criminal History Category is I.

2         Upward departure, 5K2.0, again, I have the

3    discretion to depart where the guidelines do not

4    adequately take into account aggravating circumstances

5    of the offense conduct.  As I found before, I find that

6    3A1.4 does not adequately take into account the

7    defendant's intent to frighten, intimidate, and coerce

8    private individuals at the U.S. Forest Industries,

9    through your actions.  I exercise my discretion under

10   5K2.0 to depart upward by 12 levels, resulting in an

11   offense level of 28, that resulting offense level that

12   would have been applied had the enhancement in fact --

13   terrorism enhancement been applied.

14        Resulting guidelines range based on an offense

15   level of 28 and a Criminal History Category of I is 78

16   to 97 months.

17        And, Mr. Ray, your motion.

18        MR. RAY:  Consistent with the government's

19   motion at the previous sentencing hearings, we would

20   move for a downward departure for substantial assistance

21   of four levels.

22        THE COURT:  And as I indicated again, I have

23   the -- as I have in all the cases, I have the discretion

24   to increase the departure for substantial assistance or

25   depart downward for reasons not taken into account by

1    the guidelines.  And I've articulated some of those, and
2    I would note as follows, and I've stated them before,
3    but I'll just highlight that you have rendered
4    extraordinary cooperation with the government.  You were
5    timely.  You were truthful.  And I also want to
6    acknowledge that you did remove yourself from the prior
7    criminal conduct because you became aware of the
8    consequences, the very, very serious consequences of
9    your actions.  And you have taken enormous steps to walk
10   a productive and positive direction with tremendous
11   commitment and success to making a difference through
12   the health care field.  And I think that's to be noted.
13   And I think that is a clear goal is to deter future
14   behavior, to provide safety in the community, to give
15   you a hope through the form of rehabilitation, and the
16   opportunity to make a difference.  And then the
17   accountability factor is there, and you are going to be
18   held accountable for your actions.

19            And, again, Ms. Tankersley, it's -- it -- it's
20   so hard, you know, when I know the Ninth Circuit, when
21   an appellate court looks at a sentencing record, there
22   is no question it is a paper record.  And to the extent
23   we go through all the calculations and we think we can
24   by rule and by mathematics change people's behavior, the
25   Congress has determined there will be guidelines, and we

1    will make those calculations, and the Supreme Court has
2    dictated that those calculations will be made, and that
3    we will, in the framework of trying to provide
4    reasonable, yet not greater than necessary, sentences,
5    and that they be fair whether you are sentenced in
6    Vermont, West Virginia, Montana, or Oregon, to the best
7    of the ability of the federal judiciary, we try very
8    hard to do the calculations and meet those expectations
9    that, I would tell you, are moving targets.  And so
10   we've worked hard, I think, to try to do that.

11          But I would tell you the factors in 3553 that
12   we've articulated, nature and circumstances of this
13   offense, your own criminal history characteristics, poor
14   decision-making, judgment, all those factors as a young
15   person that you, I know, wish you could take back today,
16   the goals of sentencing which I articulated, and then
17   other factors in this case that really give the court a
18   chance to make a decision, and that is, I've really
19   watched and looked and tried to understand each one of
20   you as you come before me in the context of how did --
21   you know, how did this really work?  None of us will
22   ever truly understand what swept everybody into thinking
23   this is the way to go, this was the way to create a
24   change, this was the way to strike back and be heard,
25   but it strikes me that in this particular instance, you

1    are entitled to two levels -- an additional two levels,
2    and I'm going to give you those two levels as an
3    opportunity for you to understand that in the context of
4    all this, that's where I see you fitting in.  I've
5    struggled with that.  I think you and Ms. Savoie are
6    very, very close, yet different.  And I struggled, when
7    I sentenced you, between trying to do justice to you and
8    Ms. Savoie, and everyone else, but more clearly tried to
9    balance that out.

10        But I think on -- the best way I can tell you,
11   when you sit down and taking -- going so far over here,
12   when I sat yesterday for four hours in our drug court,
13   which is really a postprison supervision program for
14   people coming out, and it's the opportunity to see how
15   we can help people come back in and make a difference,
16   and what is needed, and what's necessary, and who's
17   likely to come back and be successful?  I take all that
18   into account in looking at where you are all going to
19   end up at some point, and that is back in the community
20   and moving forward.

21        I want you to be one of the people that we can
22   turn to in this system and say, you know, I can live
23   with the fact I was held accountable, because I did make
24   bad decisions.  I did apologize.  And I made good on
25   the -- to the best of my ability -- on restitution.

1   That's important in coming to a point of acceptance and
2   of forgiveness of yourself and your ability to have
3   somebody else forgive you.  And, finally, for the rest
4   of your days, as I told Mr. Paul, the legacy that he has
5   today, that all that he did that didn't even get
6   counted, he left a legacy of disaster and destruction.

7            You are not -- you have some of that, so you
8   have a lot to make up on a go-forward basis.  And I
9   believe you, along with a number of the defendants that
10  I've sentenced in this case, will, in fact, do that.  So
11  to the extent that there is a motivation and an
12  incentive for you to do that, I hope today gives you
13  that.  I also hope it gives you some closure.  And you
14  can go forward and move beyond this particular point in
15  your life.

16           So I depart downward two levels for a final
17  offense level of 22, with an applicable guidelines
18  range, then, of 41 to 51 months.  So I've got to pull
19  my -- calculate all these additional 3553 factors.

20           So with regard to count 1, you're committed to
21  the Bureau of Prisons for confinement for a period of
22  41 months.

23           With regard to counts 2 and 3, you are
24  committed to the Bureau of Prisons for confinement for a
25  period of 41 months, to be served concurrently with the

1   sentences imposed on count 1 and each other.

2          You shall pay the full restitution to the

3   victim identified in the presentence report.  And as I

4   indicated, the total amount is $983,615.99, interest

5   shall be waived.

6          Upon release from confinement, you will serve a

7   three-year term of supervised release, subject to the

8   standard conditions of supervision adopted by this court

9   and upon the following special conditions:

10         First, you shall cooperate in the collection of

11  DNA as directed by your probation officer if required by

12  law.

13         Next, as indicated, you will pay the full

14  restitution to the victim identified in the presentence

15  report in the amount of $983,615.19 (sic).

16  Specifically, you shall relinquish any rights to the

17  $150,000 bond currently posted with the court.  And that

18  this bond be applied to the restitution.  If there is an

19  unpaid balance at the time of your release from custody,

20  it shall be paid at the maximum installment possible,

21  but not less than $200 per month, or 10 percent of

22  gross, whichever is greater.

23         And should the matter be resolved, I would

24  appreciate, again, I'll be notified, and that we will

25  adjust the judgment accordingly.

1           Next, you're prohibited from incurring new
2   credit card charges or opening additional lines of
3   credit without the approval of the Probation Office.

4           Next, you shall authorize release to the US
5   Probation Office any and all financial information by
6   execution of a release of financial information form, or
7   by any other appropriate means as directed by your
8   probation officer.

9           Next, your employment shall be subject to
10  approval by your probation officer.

11          You shall disclose all assets, liabilities to
12  your probation officer.  And you shall not transfer,
13  sell, give away, or otherwise convey any asset with a
14  fair market value in excess of $500 without the approval
15  of your probation officer.

16          Next, you shall have no contact with those
17  known to be in or having been involved in environmental
18  or animal rights activism where violence is a means of
19  their political message.  And if there is a concern
20  about what activities and what groups you can
21  participate in, please submit that list to the court.  I
22  in no way want anyone to be prohibited from exercising
23  their right to petition their government for change or
24  organize on behalf of -- appropriately on behalf of
25  their passion for the environment, but certainly not to

```
1   be associating with known -- individuals who advocate
2   violence as their means of change.
3           And you shall not participate in environmental
4   or animal rights activism group or groups where, again,
5   the primary purpose is the use of violence as a means of
6   changing hearts and minds.
7           I'm not imposing a fine, making the decision
8   you have no financial resources or appreciable earning
9   ability to pay beyond the obligations that are
10  substantial for restitution.
11          You are required to pay a fee assessment in the
12  amount of $300.
13          You entered into a plea agreement waiving all
14  or part of your appeal rights. If you wish to file a
15  notice of appeal, you may do so. If you cannot afford
16  to do so, contact the clerk's office, it will be done
17  for you and done for free.
18          I'm going to ask in a moment about, again,
19  surrender dates and placement. But I guess I want to
20  end by stating the following: It's not, again, gone
21  without notice that your family has been here. And I
22  know they don't live in this state. And I think that is
23  a huge, huge support, and comfort to all of us in the
24  room that you have the ability to have family stand by
25  you and be there and get you through this. And
```

1  understand that when people make mistakes, people also

2  have the right to go back and correct those mistakes,

3  and go forward. And it's -- there are people who come

4  into this courtroom and it is an empty chamber. It's

5  empty. It doesn't matter whether you are rich or poor.

6  But you have family support. And to the extent that you

7  have issues that are important to you that they've not

8  heard, I hope they will accept you for who you are and

9  appreciate and give you all the guidance and support you

10  need. And I think that's done without saying. But at

11  the same time, they need to help support you walking

12  through this sentence, and at the same time, you need to

13  give them the benefit of the doubt in terms of --

14  they've been there for you, and maybe someday down the

15  road for some other young person, you can indicate to

16  them that sometimes your parents really are the people

17  you need to go to when you are having the toughest time,

18  and maybe they can help you walk through it, and it's

19  hard on parents to do that, but that's their job.

20       So I think in the bigger scheme of things, you

21  may be a big help to other people who have lots of

22  issues that they are not able to take to their family.

23  Okay.

24       So placements?

25       MR. FOREMAN: Your Honor, we had originally

1   arranged a surrender date for, I think, September 4th.
2   The proceedings, obviously, are protracted here, and it
3   may not be a realistic date.

4           I've discussed the matter with the probation
5   officer.  And we've suggested that we -- assuming that
6   your order goes out and the process begins, we'll see
7   about the need to adjust it depending upon how long
8   things take.  It's our understanding that everything is
9   running through Texas now and things are protracted, but
10  I think, with the court's permission, we come back as
11  necessary.

12          THE COURT:  Yeah, please do.  Because I've sent
13  letters off on, I would say, maybe a third of all the
14  cases, and already have responses back that they've not
15  done the placement determinations.  And it is taking,
16  for every single case we have, substantially longer to
17  get placement out of the consolidated offices of BOP in
18  Texas.  And that's a detriment to the entire system
19  countrywide, and I think we're all concerned.

20          But in these particular cases, I am watching
21  carefully.  And I think just like any number of the
22  other defendants that I've strongly stated it would be
23  a -- it would be wrong to put them in a special unit and
24  not utilize their ability to educate others, and to
25  provide some guidance in the general population when

```
 1   they've made a commitment to do that, and have been
 2   successful in a number of them over in the Lane County
 3   jail, that would be a costly and poor decision.  And so
 4   at least I want to have them give me their best
 5   explanation.
 6            MR. FOREMAN:  Thank you, Your Honor.
 7            THE COURT:  Anything else?
 8            MR. FOREMAN:  Nothing here.
 9            MR. RAY:  I hesitate to mention this for the
10   purpose of 80 cents, but I believe the court said 19
11   cents and it should be 99 cents at the end of --
12            THE COURT:  I might have said 90 cents.  I
13   might have said 99.  And I might have -- the last one
14   said 98.  And I will -- it is 99.
15            MR. RAY:  Okay.
16            THE COURT:  Thank you, Mr. Ray.  Thank you very
17   much.
18            I have appreciated your -- things always look
19   different in a different jurisdiction.  And it's been
20   always a pleasure to have out-of-circuit counsel here.
21   And I thank you for your courtesies as well.
22            MR. FOREMAN:  Thank you, Your Honor.
23            THE COURT:  And I'll tell you, in each case,
24   I've really appreciated everybody's excellent work, so
25   thank you.
```

```
 1              MR. WALKER:  Your Honor, excuse me, was the
 2    court going to make a recommendation to the Bureau of
 3    Prisons as far as a facility?
 4              MS. LEE:  Dublin.
 5              MR. FOREMAN:  We've asked for Dublin.
 6              THE COURT:  Dublin, I think, was -- was that
 7    the request earlier?
 8              MS. LEE:  Yes.
 9              MR. FOREMAN:  It was, in fact, our request,
10    Your Honor.
11              THE COURT:  Yeah, Dublin, absolutely.
12              MR. WALKER:  On September 4th?
13              THE COURT:  No.  Let's move it out 60 days --
14    that's from before.  Let's move it out 60 days from
15    today's date, because that's -- it's taken at least
16    60 days as a date.  And then if we're getting close, and
17    we don't have a designation, I'm going to bump it until
18    I have a designation.
19              MR. WALKER:  Okay.
20              MR. FOREMAN:  Thank you, Your Honor.
21              THE COURT:  I'm going to offer you this.  I am
22    getting letters on a regular basis from Mr. Meyerhoff.
23    And I know, if you read the paper, you know that.  And I
24    have found that helpful.  I've learned a lot from his
25    insights on what -- you know, what is available and what
```

1   is not available.  So I have a particular interest in
2   Dublin should you end up there, along with the other
3   women's facilities, and so what's available for work and
4   rehabilitative opportunities in the jail matters -- and
5   prison matters to me.  And to the extent that you can
6   give me some insight and would care to do that, I would
7   appreciate it.
8              THE DEFENDANT:  Certainly, Your Honor.
9              THE COURT:  Thank you.
10             (The proceedings were concluded at 4:33 p.m.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1                        CERTIFICATE

2          I, Deborah Wilhelm, Certified Shorthand Reporter

3     for the State of Oregon, do hereby certify that I was

4     present at and reported in machine shorthand the oral

5     proceedings had in the above-entitled matter.  I hereby

6     certify that the foregoing is a true and correct

7     transcript, to the best of my skill and ability, dated

8     this 5th day of September, 2007.

9

10

11

12

13                              Deborah Wilhelm, RPR
                                Certified Shorthand Reporter
                                Certificate No. 00-0363
14

15

16

17

18

19

20

21

22

23

24

25